IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KELLY RENEE GISSENDANER,

    Petitioner,

      v.

KATHY SEABOLT
Warden, Metro State Prison,

    Respondent.

CIVIL ACTION FILE
NO. 1:09-CV-69-TWT

## ORDER

    This is a Petition for a Writ of Habeas Corpus in a state death penalty case.  It is before the Court on the Petitioner's Motion for Leave to Conduct Discovery [Doc. 43], which is DENIED.

### I.  Introduction

    Petitioner Kelly Gissendaner and her co-defendant Gregory Owen were indicted in the Superior Court of Gwinnett County on May 1, 1997, on one count of malice murder and one count of felony murder.  The State filed its notice of intent to seek the death penalty against the Petitioner on May 6, 1997.  Following a jury trial, the Petitioner was convicted of malice murder.  The Georgia Supreme Court summarized the facts as follows:

Gissendaner and the victim had been married, divorced, remarried, separated, and reunited between 1989 and 1997.  Ms. Gissendaner was in a relationship with Gregory Bruce Owen and at one point stated to a coworker that she was unhappy with her husband and in love with Owen.

Prior to Gissendaner's trial, Owen entered an agreement not to seek parole within 25 years, pled guilty, and received a sentence of life in prison.  Owen testified at Gissendaner's trial that it was she who first raised the idea of murder and that she later raised the idea again several other times.  Owen suggested divorce as an alternative, but Gissendaner insisted upon murder because she believed she would receive insurance money from her husband's death and because she believed he "wouldn't leave [her] alone by just divorcing him." Gissendaner had previously stated to Owen's sister that she intended to use the victim's credit to get a house and then "get rid of him."

During the days leading up to the murder, Gissendaner made 47 telephone calls to Owen and paged him 18 times.  Telephone records also showed that the pair were together at a bank of payphones several hours before the murder.   On the evening of February 7, 1997, Gissendaner drove Owen to her family's home, gave him a nightstick and a large knife, and left him inside the home to wait for the victim. Gissendaner then drove to a friend's house, and, upon Gissendaner's insistence that the group keep their plans for the evening, she and her friends went out to a nightclub.

The victim arrived home shortly after 10:00 p.m.  Owen confronted the victim from behind, held a knife to his throat, forced him to drive to a remote location, forced him to walk into the woods and kneel, and then killed him by striking him with the nightstick and then stabbing him repeatedly in the back and neck with the knife.  As instructed by Gissendaner, Owen took the victim's watch and wedding ring before killing him to make the murder appear like a robbery.

Gissendaner returned home from the nightclub at about the time the murder was being carried out, paged Owen with a numeric signal, and then drove to the crime scene.  After inquiring if her husband was dead, she took a flashlight and went toward the body to inspect it.  Owen

burned the victim's automobile with kerosene provided by Gissendaner, and the pair returned to their respective homes in Gissendaner's automobile. Owen disposed of the nightstick, the knife, a pair of his own jeans, and the victim's stolen jewelry by placing them in the garbage. A pair of Owen's sweat pants also worn on the night of the murder was recovered, however, and DNA analysis of blood found on them showed a likely match with the victim's and Owen's blood.

After the murder, Gissendaner concealed her relationship with Owen from police and claimed not to have initiated contact with him for some time.   Telephone records, Owen's testimony, and other witness testimony proved otherwise.  After her arrest, Gissendaner called her best friend and confessed to her active and willing role in the murder, although she then called a second time and claimed that she was coerced into participating.  Gissendaner wrote a letter while in jail in an effort to hire someone to give perjured testimony and to rob and beat witnesses.

Gissendaner v. State, 272 Ga. 704, 705 (2000).

At the sentencing phase of the trial, the jury found two aggravating circumstances: (1) that the murder of Douglas Gissendaner was committed during the commission of a kidnaping with bodily injury, see O.C.G.A. § 17-10-30(b)(2); and (2) that the Petitioner caused or directed another to commit murder, see O.C.G.A. § 17-10-30(b)(6).  The Petitioner was sentenced to death.  The Georgia Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal and denied her motion for reconsideration.  Gissendaner, 272 Ga. at 704.  The United States Supreme Court denied her petition for a writ of certiorari and her motion for rehearing. Gissendaner v. Georgia, 531 U.S. 1196 (2001) (rehearing denied, 532 U.S. 1003 (2001)).

On December 18, 2001, the Petitioner filed a habeas corpus petition in the Superior Court of DeKalb County.  (Resp. Ex. 80.)  The court held an evidentiary hearing on December 13 and 14, 2004.  On February 16, 2007, the court denied the petition.  (Resp. Ex. 123.)  On appeal, the Georgia Supreme Court affirmed the Superior Court's denial of relief and denied the Petitioner's motion for reconsideration.  On January 9, 2009, Ms. Gissendaner petitioned this Court for a writ of habeas corpus.  She now moves to take discovery in support of certain claims in her Amended Petition.

## II.  Standard

Rule 6 of the Rules Governing § 2254 Cases provides that a judge may authorize a party to conduct discovery if the requesting party shows good cause. Good cause exists where "the petitioner may, if the facts are fully developed, be able to demonstrate that [she] is . . . entitled to relief."  Bracy v. Gramley, 520 U.S. 899, 909 (1997).  Additional barriers exist where the petitioner has "failed to develop" the factual basis for his claim in state court.  28 U.S.C. § 2254(e)(2); see also Williams v. Taylor, 529 U.S. 420, 432 (2000).  Specifically, § 2254(e)(2) of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-

(A) the claim relies on-

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

III.   <u>Discussion</u>

A.   <u>DNA Evidence</u>

The Petitioner asks the Court to order the GBI to produce Gregory Owen's sweatpants, Douglas Gissendaner's clothing and boots, and debris and fabric samples from Douglas Gissendaner's car.  At trial, the State showed that Owen's sweatpants had blood stains on them and contained DNA from Mr. Gissendaner.  The Petitioner retained a DNA expert at the State's expense to review the GBI's conclusions, but she did not offer any rebuttal evidence.  It appears that she first asked to retest the sweatpants at the close of discovery in her state habeas proceedings.  According to the Petitioner, she asked then for two reasons.  First, she says that "just prior to the close

of discovery," she received "credible information that a key state witness offered falsified evidence at her trial . . . [that] bears in part on the issue of the sweatpants and the DNA testing conducted on them."  (Petitioner's Mot. for Leave to Conduct Disc. at 7.)  Second, she says that she had "difficulty obtaining from the GBI the specific DNA information required for her expert to assess it," and therefore did not receive her expert's report, which recommended additional testing, until the close of discovery.  (Petitioner's Mot. for Leave to Conduct Disc. at 8.)  She requested a discovery extension, but the court denied her request because she had already received two discovery extensions.

These allegations are not enough to entitle the Petitioner to additional discovery.  She does not identify the source of the "newly discovered information" or the identity of the "key state witness."  Nor has she explained how the alleged misconduct "bears in part on the issue of the sweatpants" or how retesting the sweatpants might entitle her to relief.  Likewise, she does not describe the "difficulty" she encountered in obtaining the DNA evidence or explain what efforts she made to obtain the DNA information during trial or at the state habeas proceedings.  Without more, she cannot show that she is entitled to discovery.

The Petitioner also asks the Court to order the GBI to produce Mr. Gissendaner's clothing, boots, and car debris for testing.  During the Petitioner's state

habeas proceedings, her crime scene expert, Robert Tressel, reviewed the evidence presented at trial.  He noticed two discrepancies between the physical evidence and Owen's testimony.  First, Owen testified that Mr. Gissendaner was kneeling when he stabbed him.  Tressel says that blood spatter on the knee of Mr. Gissendaner's pants suggests that he was standing.  Second, Owen made inconsistent statements about what type of accelerant he used to burn Mr. Gissendaner's car.  He initially said that he used gasoline and later testified that he used kerosene.  The Petitioner says that more DNA testing might confirm these discrepancies and reveal others, thereby damaging Owen's credibility.

There is no evidence that the Petitioner adequately developed these claims at the state level.  She did not ask the GBI to produce Mr. Gissendaner's clothing or additional car fibers at trial, and she does not explain why she did not request DNA testing at that time.  She says that she did not receive Tressel's report until six days after the close of state habeas discovery, but Tressel's affidavit setting forth his findings is dated over four months before the close of discovery.  Moreover, even if she could show that she adequately developed the factual basis for these claims, she has not shown good cause.  Specifically, she has not explained to the Court why two minor discrepancies in Owen's testimony would entitle her to relief.  Accordingly, her request for discovery on DNA evidence is denied.

B.    Proportionality Review

Pursuant to O.C.G.A. § 17-10-35, the Supreme Court of Georgia reviews all death sentences to determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." O.C.G.A. § 17-10-35(c)(3).  The Petitioner says that her sentence is disproportionate and that the Georgia Supreme Court conducted an inadequate and "perfunctory" proportionality review.  She asks the Court for permission to depose employees at the Georgia Supreme Court about proportionality reviews conducted during the past 34 years.   She believes that this evidence will help her show that Georgia's proportionality review is unconstitutional on its face and as applied.

There is no evidence that the Petitioner adequately developed the factual basis of her proportionality claim in state court.  She did not ask to depose Georgia Supreme Court employees during her state habeas proceedings, and she does not explain why she did not.  Therefore, she must satisfy the more stringent requirements of § 2254(e) to obtain discovery.  But she makes no argument that the claim relies on a new rule of constitutional law or that the factual predicate to the claim could not have been discovered during state proceedings.  Therefore, she is not entitled to additional discovery on her proportionality claim.

C.    Parole Files

The Petitioner also seeks all files on herself, Gregory Owen, and Laura McDuffie held by the Georgia Board of Pardons and Paroles.  She says that Owen's file "may contain information regarding Owen which was favorable to Petitioner's defense at trial, as well as on direct and collateral appeal," including Brady material and information about Owen's plea agreement "suggesting that there was more of a deal, or a different kind of deal, than the trial testimony and other documents indicated."  (Petitioner's Mot. for Leave to Conduct Disc. at 19-20.)  Likewise, she says that McDuffie's file may contain Brady material, "information about the existence and substance of a deal between McDuffie and the District Attorney's office," and "negative evaluations of her credibility."  She does not explain what type of information she expects to find in her own file.

The Petitioner requested and received these files during her state habeas proceedings.  She found nothing that entitled her to habeas relief, but she thinks that the files may contain new information.  However, she has no evidence that the files contain Brady material or other favorable information, and mere speculation is not enough to establish good cause.  Arthur v. Allen, 459 F.3d 1310, 1311 (11th Cir. 2006) ("[G]ood cause for discovery cannot arise from mere speculation.").

Moreover, to the extent she claims that the files contain information about plea agreements, she is not entitled to discovery because the Court dismissed as

unexhausted Claim II, ¶ 147 of her Amended Petition.  This paragraph alleged that "[t]he state failed to disclose benefits or promises extended to State witnesses in exchange for their testimony."  Accordingly, the Petitioner is not entitled to discovery related to the Pardons and Paroles' files.

      D.     <u>Evidence Relating to Execution Protocols</u>

In support of her claim that execution by lethal injection is cruel and unusual punishment prohibited by the Eighth Amendment, the Petitioner seeks the following: the execution protocols used in Georgia and in the other states using lethal injection as the method for execution; an order requiring the videotaping of a Georgia execution by lethal injection; depositions of witnesses to lethal injection executions that have occurred in Georgia and other states; depositions of all corrections and medical personnel involved in developing Georgia's lethal injection protocol and the protocols in other states; depositions of corrections and medical personnel involved in executing Georgia prisoners and prisoners in other states using lethal injection; depositions of the chief medical officer in charge of state prisoner medical care in Georgia and in other states using lethal injection for executions; records maintained by any government entity regarding the preparation for and administration of lethal injection execution of executed prisoners in Georgia and in other states; licenses and other credentials of all corrections and medical personnel involved in the process of

executing prisoners in Georgia and in other states by lethal injection; adequate time for expert analysis of the results obtained from discovery; and an order permitting an expert to attend a Georgia execution by lethal injection.

It does not appear that the Petitioner sought any of the evidence she now requests during her state habeas proceedings, and she does not explain why. Therefore, she must satisfy the more stringent requirements of § 2254(e) to obtain discovery.  However, she makes no argument that the claim relies on a new rule of constitutional law or that the factual predicate to the claim could not have been discovered during state proceedings.  She simply says that "the law was in great flux on these issues" during her state proceedings.  (Petitioner's Mot. for Leave to Conduct Disc. at 22.)  This is not enough to warrant additional discovery.

Moreover, even if she had developed the factual basis of her claim at the state level, she cannot show good cause. Good cause exists where "the petitioner may, if the facts are fully developed, be able to demonstrate that [she] is . . . entitled to relief." Bracy v. Gramley, 520 U.S. 899, 909 (1997).  Here, none of the requested discovery will entitle the Petitioner to relief because the Eleventh Circuit already upheld Georgia's use of the three-drug protocol in Wellons v. Hall, 554 F.3d 923 (11th Cir. 2009):

> Wellons attacks the constitutionality of Georgia's use of the three-drug protocol method of execution by lethal injection. He argues that the

three-drug protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment and that the district court erred in denying an evidentiary hearing on his Eighth Amendment claim. Both of these claims have been foreclosed by <u>Baze v. Rees</u>, in which the United States Supreme Court upheld a similar three-drug lethal injection protocol as not constituting cruel and unusual punishment under the Eighth Amendment.

<u>Wellons</u>, 554 F.3d at 942, <u>vacated on other grounds</u>, 130 S. Ct. 727 (2010).

Accordingly, the Petitioner is not entitled to additional discovery relating to her claim that execution by lethal injection is cruel and unusual punishment.

## IV.  Conclusion

For the reasons stated above, the Petitioner's Motion for Leave to Conduct Discovery [Doc. 43] is DENIED.

SO ORDERED, this 21 day of December, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge