IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KELLY RENEE GISSENDANER,

    Petitioner,

      v.

KATHY SEABOLT
Warden, Metro State Prison,

    Respondent.

CIVIL ACTION FILE
NO. 1:09-CV-69-TWT

ORDER

    This is a Petition for a Writ of Habeas Corpus in a state death penalty case.  It is before the Court on the Petitioner's Motion for an Evidentiary Hearing [Doc. 47] and the Petitioner's Motion for Access to Physical Evidence [Doc. 48].  The motions are DENIED.

## I.  Introduction

    Petitioner Kelly Gissendaner and her co-defendant Gregory Owen were indicted in the Superior Court of Gwinnett County on May 1, 1997, on one count of malice murder and one count of felony murder.  The State filed its notice of intent to seek the death penalty against the Petitioner on May 6, 1997.  Following a jury trial, the

Petitioner was convicted of malice murder.  The Georgia Supreme Court summarized

the facts as follows:

> Gissendaner and the victim had been married, divorced, remarried, separated, and reunited between 1989 and 1997.  Ms. Gissendaner was in a relationship with Gregory Bruce Owen and at one point stated to a coworker that she was unhappy with her husband and in love with Owen.
>
> Prior to Gissendaner's trial, Owen entered an agreement not to seek parole within 25 years, pled guilty, and received a sentence of life in prison.  Owen testified at Gissendaner's trial that it was she who first raised the idea of murder and that she later raised the idea again several other times.  Owen suggested divorce as an alternative, but Gissendaner insisted upon murder because she believed she would receive insurance money from her husband's death and because she believed he "wouldn't leave [her] alone by just divorcing him." Gissendaner had previously stated to Owen's sister that she intended to use the victim's credit to get a house and then "get rid of him."
>
> During the days leading up to the murder, Gissendaner made 47 telephone calls to Owen and paged him 18 times.  Telephone records also showed that the pair were together at a bank of payphones several hours before the murder.  On the evening of February 7, 1997, Gissendaner drove Owen to her family's home, gave him a nightstick and a large knife, and left him inside the home to wait for the victim.  Gissendaner then drove to a friend's house, and, upon Gissendaner's insistence that the group keep their plans for the evening, she and her friends went out to a nightclub.
>
> The victim arrived home shortly after 10:00 p.m.  Owen confronted the victim from behind, held a knife to his throat, forced him to drive to a remote location, forced him to walk into the woods and kneel, and then killed him by striking him with the nightstick and then stabbing him repeatedly in the back and neck with the knife.  As instructed by Gissendaner, Owen took the victim's watch and wedding ring before killing him to make the murder appear like a robbery.

Gissendaner returned home from the nightclub at about the time the murder was being carried out, paged Owen with a numeric signal, and then drove to the crime scene.  After inquiring if her husband was dead, she took a flashlight and went toward the body to inspect it.  Owen burned the victim's automobile with kerosene provided by Gissendaner, and the pair returned to their respective homes in Gissendaner's automobile.  Owen disposed of the nightstick, the knife, a pair of his own jeans, and the victim's stolen jewelry by placing them in the garbage.  A pair of Owen's sweat pants also worn on the night of the murder was recovered, however, and DNA analysis of blood found on them showed a likely match with the victim's and Owen's blood.

After the murder, Gissendaner concealed her relationship with Owen from police and claimed not to have initiated contact with him for some time.   Telephone records, Owen's testimony, and other witness testimony proved otherwise.  After her arrest, Gissendaner called her best friend and confessed to her active and willing role in the murder, although she then called a second time and claimed that she was coerced into participating.  Gissendaner wrote a letter while in jail in an effort to hire someone to give perjured testimony and to rob and beat witnesses.

Gissendaner v. State, 272 Ga. 704, 705 (2000).

At the sentencing phase of Petitioner's trial, the jury found two aggravating circumstances: (1) that the murder of Douglas Gissendaner was committed during the commission of a kidnaping with bodily injury, see O.C.G.A. § 17-10-30(b)(2); and (2) that the Petitioner caused or directed another to commit murder, see O.C.G.A. § 17-10-30(b)(6).  The Petitioner was sentenced to death.  The Georgia Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal and denied her motion for reconsideration.  Gissendaner, 272 Ga. at 704.  The United States Supreme Court denied her petition for a writ of certiorari and her motion for rehearing.

<u>Gissendaner v. Georgia</u>, 531 U.S. 1196 (2001) (rehearing denied, 532 U.S. 1003 (2001)).

On December 18, 2001, the Petitioner filed a habeas corpus petition in the Superior Court of DeKalb County.  (Resp. Ex. 80.)  The court held an evidentiary hearing on December 13 and 14, 2004.  On February 16, 2007, the court denied the petition.  (Resp. Ex. 123.)  On appeal, the Georgia Supreme Court affirmed the Superior Court's denial of relief and denied the Petitioner's motion for reconsideration.  On January 9, 2009, Ms. Gissendaner petitioned this Court for a writ of habeas corpus.  She now requests an evidentiary hearing to present evidence relating to DNA found on Owen's sweatpants and Georgia's method of lethal injection.

## II.  Standard

Section 2254(e)(2) of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court."  Allen v. Secretary, Florida Dept. of Corrections, 611 F.3d 740, 745 (11th Cir. 2010) (quoting Schriro v. Landrigan, 550 U.S. 465, 468 (2007)).  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  Id.

### III.   Discussion

A.   DNA Evidence

At trial, the State showed that Owen's sweatpants had blood stains on them and contained DNA from Mr. Gissendaner, Owen, and a third person.  The State presented the following testimony with respect to the identity of the third person:

> Q:   So the third blood material that you found in those tests, do you know who that would be?
>
> A:   I can't say conclusively who it, actually, is.

Q:     Do you know – well, in short you just can't make a comparison
       one way or the other with the blood –

A:     Not with any certainty, I guess would be the word.

(Testimony of Keith Goff, Ex. 37 at 2624-25.)  Ms. Gissendaner says that "the clear inference" of the State's testimony was that she was the third individual.  (Petitioner's Mot. for Evid. Hearing at 9.)  Her attorney did not offer any DNA evidence to rebut this inference.  She says that this constitutes ineffective assistance of counsel.

Ms. Gissendaner says that she diligently pursued this claim during state proceedings and therefore is not required to satisfy the § 2254(e)(2) requirements. The Court disagrees.  Ms. Gissendaner was aware of the unidentified DNA on Owen's sweatpants at trial and argued that this showed that a third person was involved in the murder.  She filed her state habeas petition on December 18, 2001.  She could have asked to retest the sweatpants then.  Instead, she waited until the close of discovery on June 14, 2004.  She requested a discovery extension to test the sweatpants, but the state habeas court denied her request because she had already received multiple extensions.

Ms. Gissendaner says that she did not ask to retest the sweatpants until June 2004 because "just before the close of discovery . . ., habeas counsel met with [Owen], who revealed for the first time that he in fact did not act alone in murdering Douglas Gissendaner."  (Petitioner's Mot. for Evid. Hearing at 11.)  But she does not explain

why Owen's statement prompted her to decide that the sweatpants should be retested. At most, his statement corroborated a theory that Ms. Gissendaner had already advanced at trial, where her attorney argued that the unidentified DNA showed that a third person had participated in the murder:

> Additionally, there's a third person's blood on these sweat pants along with the other two.  It's obviously not Kelly [Gissendaner's] or they would have told you that.  So whose blood is it?  Why is it on Mr. Owen's sweat pants?

(Res. Ex. 37 at 2688.)  Because she does not offer a valid explanation for waiting over two-and-a-half years after filing her state habeas petition to ask to retest the sweatpants, Ms. Gissendaner cannot show that she diligently pursued this claim in state proceedings.  Moreover, she cannot show, and does not attempt to show, that her claim relies on a new rule of constitutional law or a factual predicate that could not have been previously discovered.  Accordingly, she is not entitled to access to Owen's sweatpants or to an evidentiary hearing on this issue.

B.     Eighth Amendment Claim

Ms. Gissendaner also seeks an evidentiary hearing in support of her claim that Georgia's current stock of lethal injection drugs is unsafe and violate her Eighth Amendment right to be free from cruel and unusual punishment.  Georgia's lethal injection protocol calls for the intravenous administration of three drugs.  Sodium Pentothal, the first drug administered, is a short-acting anesthetic that causes the

inmate to become unconscious.  The proper administration of Sodium Pentothal "eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections" of the other two drugs. <u>Baze v. Rees</u>, 553 U.S. 35, 49 (2008). Due to recent manufacturing problems, there has been a nationwide shortage of Sodium Pentothal.  In 2010, the Georgia Department of Corrections obtained 75 doses of the drug from an alternative supplier outside the United States.  Ms. Gissendaner says that there are quality issues with the recently acquired drugs and that she faces "a substantial risk of serious harm . . . should the GDOC attempt to utilize these drugs in her execution."  (Petitioner's Mot. for Evid. Hearing at 21.)

"Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983." <u>Hill v. McDonough</u>, 547 U.S. 573, 579 (2006).  Challenges to "the validity of any confinement or to particulars affecting its duration" should be raised in a federal habeas petition, while challenges to "the circumstances of confinement" should be brought under § 1983.  <u>Id.</u> at 579.  Because Ms. Gissendaner's challenge to the constitutionality of Georgia's current stock of lethal injection drugs is not a challenge to the fact of her conviction or the duration of her sentence, it is not an appropriate claim for habeas review.  Instead, other courts considering similar claims have held

that § 1983 is the appropriate vehicle for this type of claim.  For example, in <u>Nelson v. Campbell</u>, 541 U.S. 637 (2004), a state prisoner filed a civil rights action under § 1983 alleging that Alabama's proposed use of a "cut-down" procedure to access his "severely compromised" veins during a lethal injection procedure constituted cruel and unusual punishment.  The Supreme Court held that a § 1983 suit was an appropriate avenue to challenge Alabama's procedure.  <u>Id.</u> at 646; <u>see also</u> <u>Hill</u>, 547 U.S. at 579 (permitting inmate to challenge lethal injection protocol in § 1983 suit); <u>Blankenship v. Owens</u>, 1:11-cv-429-TCB, 2011 WL 610967 (N.D. Ga. Feb. 15, 2011)(recognizing that § 1983 is the appropriate avenue to challenge the constitutionality of Georgia's current stock of lethal injection drugs).  Although the Supreme Court has not explicitly held that habeas corpus is an inappropriate avenue to bring these types of challenges, the Eleventh Circuit has made clear that habeas actions and § 1983 actions "are mutually exclusive."  <u>Hutcherson v. Riley</u>, 468 F.3d 750, 754 (11th Cir. 2006).  Accordingly, Ms. Gissendaner is not entitled to an evidentiary hearing on her lethal injection claim.

## IV.   Conclusion

For the reasons stated above, the Petitioner's Motion for an Evidentiary Hearing [Doc. 47] and the Petitioner's Motion for Access to Physical Evidence [Doc. 48] are DENIED.

SO ORDERED, this 12 day of May, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge