IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KELLY RENEE GISSENDANER,

    Petitioner,

      v.

KATHY SEABOLT
Warden, Metro State Prison,

    Respondent.

CIVIL ACTION FILE
NO. 1:09-CV-69-TWT

ORDER

    This is a habeas corpus action in a state death penalty case. It is before the Court on the Amended Petition for Writ of Habeas Corpus [Doc. 16]. For the reasons set forth below, the Court DENIES the Amended Petition.

## I. Background

    Petitioner Kelly Gissendaner and her co-defendant Gregory Owen were indicted in the Superior Court of Gwinnett County on May 1, 1997, on one count of malice murder and one count of felony murder. The State filed its notice of intent to seek the death penalty against the Petitioner on May 6, 1997. Following a jury trial, the Petitioner was convicted of malice murder. The Georgia Supreme Court summarized the facts of her case as follows:

Gissendaner and the victim had been married, divorced, remarried, separated, and reunited between 1989 and 1997. Ms. Gissendaner was in a relationship with Gregory Bruce Owen and at one point stated to a coworker that she was unhappy with her husband and in love with Owen.

Prior to Gissendaner's trial, Owen entered an agreement not to seek parole within 25 years, pled guilty, and received a sentence of life in prison. Owen testified at Gissendaner's trial that it was she who first raised the idea of murder and that she later raised the idea again several other times. Owen suggested divorce as an alternative, but Gissendaner insisted upon murder because she believed she would receive insurance money from her husband's death and because she believed he "wouldn't leave [her] alone by just divorcing him." Gissendaner had previously stated to Owen's sister that she intended to use the victim's credit to get a house and then "get rid of him."

During the days leading up to the murder, Gissendaner made 47 telephone calls to Owen and paged him 18 times. Telephone records also showed that the pair were together at a bank of payphones several hours before the murder. On the evening of February 7, 1997, Gissendaner drove Owen to her family's home, gave him a nightstick and a large knife, and left him inside the home to wait for the victim. Gissendaner then drove to a friend's house, and, upon Gissendaner's insistence that the group keep their plans for the evening, she and her friends went out to a nightclub.

The victim arrived home shortly after 10:00 p.m. Owen confronted the victim from behind, held a knife to his throat, forced him to drive to a remote location, forced him to walk into the woods and kneel, and then killed him by striking him with the nightstick and then stabbing him repeatedly in the back and neck with the knife. As instructed by Gissendaner, Owen took the victim's watch and wedding ring before killing him to make the murder appear like a robbery.

Gissendaner returned home from the nightclub at about the time the murder was being carried out, paged Owen with a numeric signal, and then drove to the crime scene. After inquiring if her husband was dead,

she took a flashlight and went toward the body to inspect it. Owen burned the victim's automobile with kerosene provided by Gissendaner, and the pair returned to their respective homes in Gissendaner's automobile. Owen disposed of the nightstick, the knife, a pair of his own jeans, and the victim's stolen jewelry by placing them in the garbage. A pair of Owen's sweat pants also worn on the night of the murder was recovered, however, and DNA analysis of blood found on them showed a likely match with the victim's and Owen's blood.

After the murder, Gissendaner concealed her relationship with Owen from police and claimed not to have initiated contact with him for some time. Telephone records, Owen's testimony, and other witness testimony proved otherwise. After her arrest, Gissendaner called her best friend and confessed to her active and willing role in the murder, although she then called a second time and claimed that she was coerced into participating. Gissendaner wrote a letter while in jail in an effort to hire someone to give perjured testimony and to rob and beat witnesses.

Gissendaner v. State, 272 Ga. 704, 705 (2000).

At the sentencing phase of the trial, the jury found two aggravating circumstances: (1) that the murder of Douglass Gissendaner was committed during the commission of a kidnaping with bodily injury, see O.C.G.A. § 17-10-30(b)(2); and (2) that the Petitioner caused or directed another to commit murder, see O.C.G.A. § 17-10-30(b)(6). She was sentenced to death. The Georgia Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal and denied her motion for reconsideration. Gissendaner, 272 Ga. at 704. The United States Supreme Court denied her petition for a writ of certiorari and her motion for rehearing. Gissendaner v. Georgia, 531 U.S. 1196 (2001) (rehearing denied, 532 U.S. 1003 (2001)).

On December 18, 2001, the Petitioner filed a habeas corpus petition in the Superior Court of DeKalb County.  (Res. Ex. 80.)  The court held an evidentiary hearing on December 13 and 14, 2004.  On February 16, 2007, the court denied the petition.  (Res. Ex. 123.)  On appeal, the Georgia Supreme Court affirmed the Superior Court's denial of relief and denied the Petitioner's motion for reconsideration.  On January 9, 2009, Gissendaner petitioned this Court for a writ of habeas corpus [Doc. 1], and amended the Petition on May 28, 2009 [Doc. 16].  In a February 22, 2010 Order, the Court dismissed some of the Petitioner's claims as procedurally defaulted and dismissed some as unexhausted [Doc. 39].  The Court now addresses the merits of the remaining claims in the Amended Petition.

## II.  Standard for Habeas Corpus Relief

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas corpus relief for claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first step in resolving a federal habeas corpus claim is to determine the "clearly established law

at the relevant time." Neelley v. Nagle, 138 F.3d 917, 922 (11th Cir. 1998), cert.

denied, 525 U.S. 1075 (1999); see Williams v. Taylor, 529 U.S. 362, 379 (2000). To

do so, a district court evaluating a habeas corpus petition under 28 U.S.C. §

2254(d)(1) "'should survey the legal landscape' at the time the state court adjudicated

the petitioner's claim to determine the applicable Supreme Court authority; the law

is 'clearly established' if Supreme Court precedent would have compelled a particular

result in the case." Neelley, 138 F.3d at 923. "Clearly established Federal law" does

not refer to decisions of the lower federal courts but, rather, is limited to "the holdings,

as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant

state court decision." Putman v. Head, 268 F.3d 1223, 1241(11th Cir. 2001) (quoting

Williams, 529 U.S. at 412). The second step of the analysis is to determine whether

the state court adjudication was "contrary to" or an "unreasonable application of" the

clearly established Supreme Court case law. Neelley, 138 F.3d at 923. A state court

decision is contrary to clearly established federal law when it applies a rule that

contradicts the governing law as set forth in cases before the Supreme Court of the

United States. Williams, 529 U.S. at 405; Putman, 268 F.3d at 1241. Additionally,

a "contrary to" finding will result if the state court confronts materially

indistinguishable facts but arrives at a result different from that of the Supreme Court.

Williams, 529 U.S. at 406; Putman, 268 F.3d at 1241. Finally, the Supreme Court has

explained that the "unreasonable application" prong applies when the "'state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003) (quoting <u>Williams</u>, 529 U.S. at 413). In order to qualify as unreasonable, the state court decision must have been more than incorrect or erroneous. <u>Id.</u> Rather, the state court's application of clearly established federal law must have been "objectively unreasonable." <u>Id.</u> at 521 (citing <u>Williams</u>, 529 U.S. at 409).

## III. <u>Discussion</u>

### A. <u>Ineffective Assistance of Counsel</u>

The Sixth Amendment guarantees the right to counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 684-85 (1984); <u>Powell v. Alabama</u>, 287 U.S. 45 (1932). As noted in <u>Strickland</u>, "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." <u>Strickland</u>, 466 U.S. at 685 (quoting <u>Adams v. United States ex rel. McCann</u>, 317 U.S. 269, 275-76 (1942)). For that reason, the Supreme Court has long held that the right to counsel contemplates the right to the effective assistance of counsel. <u>Id.</u>; <u>McMann v. Richardson</u>, 397 U.S. 759,

771 n.14 (1970).

In Strickland, the Supreme Court set out the two components of a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 687; see also Wiggins v. Smith, 539 U.S. 510, 521 (2003). A petitioner must first show that counsel's performance was deficient. Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 687. This requires a showing that counsel's representation "fell below an objective standard of reasonableness." Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 688. The Petitioner must then also show that counsel's deficient performance prejudiced the defense. Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 687. Unless the Petitioner makes both showings, it cannot be said that his capital sentence resulted from a breakdown in the adversarial process that denied him effective counsel.

The standard governing counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. "We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992). The Petitioner's burden to prove by a preponderance of the evidence that counsel's performance was unreasonable is a heavy one. See Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). The Petitioner must show that "no competent counsel would have taken the action that his counsel did take." Id. at

1315; Stewart v. Secretary, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007).

The Petitioner "must also establish prejudice—that but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different." Ferrell v. Hall, 640 F.3d 1199, 1234 (11th Cir. 2011) (citing Strickland, 466 U.S. at 694). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Strickland, 466 U.S. at 693. Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. Instead, the relevant inquiry when a petitioner challenges a death sentence "is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

1.    Mitigating Evidence Investigation

The Petitioner argues that her trial counsel, Ed Wilson and Steve Reilly,[1] were

---

[1]The state habeas court found that "Mr. [Steve] Reilly was responsible for interviewing mitigation witnesses." (Res. Ex. 123, at 40.) Edwin Wilson was lead counsel, and "[p]rior to Petitioner's case, [he] had prosecuted and defended numerous murder cases." (Res. Ex. 123, at 32-33.) The state habeas court determined the following regarding Mr. Reilly:

Mr. Wilson's co-counsel, Steve Reilly was appointed on June 26, 1997.

ineffective in their investigation of mitigating evidence for the sentencing phase,

including the Petitioner's alleged history of sexual abuse and mental health problems.

The Petitioner's trial counsel had an "obligation to conduct a thorough investigation

of the defendant's background." Porter v. McCollum, 130 S. Ct. 447, 452-53 (2009)

(quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)).[2]  "[E]vidence about the

defendant's background and character is relevant because of the belief, long held by

this society, that defendants who commit criminal acts that are attributable to a

disadvantaged background, or to emotional and mental problems, may be less culpable

---

Reilly graduated from the University of Georgia Law School in 1986. Following law school, he served four years of active duty in the U.S. Army Judge Advocate General's Corps.  In 1990, Mr. Reilly entered private practice in Gwinnett County.  At the time of his representation of Petitioner, his practice was about 70-75 percent criminal defense. Despite the fact that this was Mr. Reilly's first murder case, he had experience in felony cases such as armed robbery, aggravated assault, theft and drug cases.

Prior to Petitioner's case, Mr. Reilly had not attended any death penalty seminars.  However, Wilson provided Mr. Reilly with all the materials he had obtained from the death penalty seminars.  Mr. Reilly reviewed all the materials that were provided to him.  In fact, Mr. Wilson required Mr. Reilly to review all the death penalty seminar materials prior to beginning the substantive work in Petitioner's case.  Mr. Reilly received guidance from Wilson and consulted with more experienced local attorneys.

(Res. Ex. 123, at 34) (internal citations omitted).

[2]Porter v. McCollum was decided after the state habeas court issued its order.

than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). A defense counsel's unreasonable failure to investigate mitigating evidence constitutes deficient performance. "As [the Supreme Court] established in Strickland, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" Wiggins, 539 U.S. at 528 (quoting Strickland, 466 U.S. at 690-691). "A decision not to investigate...'must be directly assessed for reasonableness in all the circumstances.'" Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691). In assessing the reasonableness of the investigation, this Court must consider "whether the known evidence would [have] lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527. The Court must also consider counsel's perspective at the time investigative decisions were made and give a heavy measure of deference to counsel's judgments. Rompilla v. Beard, 545 U.S. 374, 381 (2005).

The state habeas court found that "trial counsel's investigation and presentation of the sentencing phase of Petitioner's case did not constitute deficient performance." (Res. Ex. 123, at 51.) This Court cannot find that in reaching this conclusion the state habeas court made an unreasonable determination of fact, or that its conclusion was

contrary to, or an unreasonable application of, Supreme Court precedent. This Court

finds that the Petitioner's trial counsel exercised "reasonable professional judgmen[t]"

in its investigation of the Petitioner's history of alleged sexual abuse. <u>Wiggins</u>, 539

U.S. at 522-23 (quoting <u>Strickland</u>, 466 U.S. at 691). The state habeas court found

that trial counsel's mitigation investigation included the following steps:

> Both counsel had access to an extensive journal prepared by Petitioner
> chronicling her life. Mr. Reilly testified that he interviewed the
> following individuals in preparation for the mitigation portion of
> Petitioner's case: Delphia Kemp (grandmother); Larry Brookshire
> (father); Edna Brookshire (stepmother); Earl Brookshire (grandfather);
> Leon and Marion Brookshire (aunt and uncle); Xan and Tangee
> Brookshire (cousins); Bessie Smith (paternal grandmother); Debra West
> (cousin); Emmie Conaway (grandmother); Chastine Conaway (uncle);
> Darlene Bearden (aunt); Claudine Mullens (aunt); Tommy Conaway
> (uncle); Delane Conaway (uncle); Barry Conaway (uncle); Barbara
> Grimes (cousin); Shane Brookshire (brother); and Mabel Davenport
> (close, personal family friend.)
>
> Mr. Reilly spoke with Petitioner's mother, Maxine Wade, on a regular
> basis and described her as being forthcoming with information. Trial
> counsel provided Ms. Wade with a questionnaire entitled "Suggested
> Areas to Explore in Defendant's History" and requested that she answer
> the questions. During the conversations with Ms. Wade, she provided
> information as to the family life during Petitioner's childhood.

(Res. Ex. 123, at 40-41) (internal citations omitted).

As detailed above, trial counsel undertook substantial efforts to uncover

potential mitigating evidence for the penalty phase through interviews with those

close to the Petitioner. As a result of these interviews, "[t]rial counsel was aware of

some of the allegations of physical and sexual abuse as detailed in Petitioner's journal and reported by her mother." (Res. Ex. 123, at 49.) After the interviews, the only evidence of sexual abuse that counsel possessed was the Petitioner's claim that she had been sexually abused and the Petitioner's mother's claim that the Petitioner had been sexually abused. The evidence supporting the Petitioner's mother's claim was derived solely from the Petitioner telling her of the abuse. Trial counsel's investigation did not uncover any witnesses to the abuse (other than the Petitioner), police reports, medical records, social service reports or other evidence corroborating the alleged sexual abuse. Even after habeas counsel's independent investigation into the alleged abuse, the state habeas court was not presented with any independent evidence of sexual abuse.

The Petitioner claims that other sources of evidence corroborating sexual abuse were "readily available." (Petitioner's Br., at 50.) The Petitioner cites the affidavits of the Petitioner's mother, Darlene Bearden, the Petitioner's cousin, Sheila Muller, and the Petitioner's army friend, Jodi Stephens. Muller and Stephens were not interviewed by trial counsel. Nonetheless, this Court cannot find that the state habeas court's conclusion–that trial counsel's decision to stop its investigation into the Petitioner's life history where it did was reasonable–was contrary to, or an unreasonable application of, Supreme Court precedent. "Counsel is not required to

investigate and present all available mitigating evidence in order for counsel's investigation to be reasonable." Ford v. Hall, 546 F.3d 1326, 1333 (11th Cir. 2008) (citing Burger v. Kemp, 483 U.S. 776, 794-95 (1987)). There must be some stopping point in the investigation. It was highly unlikely that further interviews would lead to persuasive evidence of sexual abuse when trial counsel made the decision to stop interviews, and quite frankly, as discussed in the evaluation of prejudice, *infra*, they did not.

The Petitioner highlights language in Steve Reilly's affidavit, which was produced several years after the sentencing phase of the Petitioner's trial. Reilly stated: "Having reviewed the detailed information provided by other family members in the affidavits referenced hereafter, I realize that I should have more thoroughly investigated this information and presented it during the sentencing phase." (Res. Ex. 83, at 313.) While laudable that Reilly is willing to testify to his own error for the benefit of his former client, this testimony does not persuade the Court that his decision to forego further interviews was unreasonable. The Supreme Court has explicitly stated that the state habeas court should consider what a reasonable attorney would have done at the time the decision was made, and not with the benefit of hindsight. See Rompilla, 545 U.S. at 381. Reilly's testimony does not support the claim that his decision was deficient at the time it was made.

The state habeas court concluded that "trial counsel made a reasonable strategic decision not to present [evidence of sexual abuse]." (Res. Ex. 123, at 49.)  In light of the uncorroborated nature of the Petitioner's claims and her mother's claims, this was not an unreasonable determination.  As Reilly testified at the habeas evidentiary hearing, "[A]nything we were going to put up in sentencing had to be substantiated to the point that it was credible in the eyes of the jury, that couldn't be tossed aside as some additional attempt as described that way by the State to defect blame." (Res. Ex. 83, at 140.)  The state sought to portray the Petitioner as a liar, an unfaithful spouse, a schemer and a manipulator of others.  Seasoned trial lawyers have a sense of when presenting flimsy evidence of doubtful relevance does more harm than good.  The state habeas court determined that the Petitioner's trial counsel made a strategic decision to refrain from presenting weak evidence of sexual abuse at the sentencing hearing, which is a finding of fact that this Court deems reasonable.  Having found that the investigation was sufficient, trial counsel's strategic decision to not present evidence of sexual abuse was reasonable.   See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

The Petitioner also claims that trial counsel were ineffective in investigating mental health issues.   The state habeas court determined that trial counsel's

investigation of the Petitioner's mental health issues was reasonable. That finding was not an unreasonable determination of the facts or contrary to, or an unreasonable application of, Supreme Court precedent. The Petitioner's habeas counsel procured three experts, Dr. Mindy Rosenberg, Dr. William Bernet, and Dr. Myla Young, who have stated that the Petitioner has serious mental health problems. Habeas counsel contends that the Petitioner's trial counsel "failed to conduct a constitutionally adequate investigation of potential avenues of mitigation, including mental health evidence." (Petitioner's Br., at 55.) This Court disagrees. The Court credits the state habeas court's factual determination that Dr. Jim Stark, a psychologist, investigated potential mitigating circumstances relating to mental health issues in addition to investigating possible insanity for the guilt phase. However, assuming, *arguendo*, that Dr. Stark only investigated "insanity" and "retardation," this Court would still not find that the state habeas court contravened or unreasonably applied Supreme Court precedent in finding counsel's investigation reasonable.

The Petitioner relies upon Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011) to argue that an attorney who conducts an insanity investigation alone, and does not delve into mental health issues for mitigation purposes, performs in a constitutionally deficient manner. See Ferrell, 640 F.3d at 1213 ("As for the first and most critical point, the mental health expert who examined [petitioner] before trial...averred that he

T:\ORDERS\09\Gissendaner\habeastwt.wpd

-15-

had not been asked to look for brain damage, that he was provided with *no* material

from counsel other than school records, and that he was not asked to perform any

clinical interview, or do anything else for that matter, for use in mitigation.")

(emphasis in original).  This Court does not review the state habeas court's decision

under Ferrell because it is not Supreme Court precedent and it was decided after the

state habeas court issued its ruling.  Nevertheless, this case is distinguishable from

Ferrell, as well as any Supreme Court case that found that trial counsel did not satisfy

its Sixth Amendment burden when it did not investigate mental health.  Unlike Ferrell

and Wiggins, the Petitioner's self-reported history did not exhibit "red flags" tending

to show mental health problems.  In Ferrell, the petitioner suffered a seizure during

the charge conference; "[h]e fell to the floor, 'flopping,' shaking and crying out

unintelligibly."  Ferrell, 640 F.3d at 1206.  The Ferrell petitioner also had other

conspicuous mental problems.  Id. at 1215-20.  In Wiggins, trial counsel uncovered

evidence that the petitioner had a very difficult childhood, but did not investigate

further and did not present any of this evidence at the sentencing hearing.  Wiggins,

539 U.S. 510, 525 ("The scope of their investigation was also unreasonable in light

of what counsel actually discovered in the DSS records.").

　　　In the present case, unlike Wiggins, "the known evidence would [not have] lead

a reasonable attorney to investigate further."  Wiggins, 539 U.S. at 527.  The state

habeas court found that trial counsel took the following actions related to a mental health investigation: investigator Dennis Miller, who was hired by the Petitioner's trial counsel, obtained the Petitioner's mental health and medical records, (Res. Ex. 123, at 38-39), and trial counsel asked the Petitioner's mother, on the previously mentioned questionnaire entitled "Suggested Areas to Explore in Defendant's History," about the Petitioner's mental health.  On the questionnaire, the Petitioner's mother stated that the Petitioner's family had no history of mental illness, that the Petitioner had no mental health history and that there was "no indication of sexual or physical abuse by parents, siblings, relatives or others." (Res. Ex. 106, at 7356-57.)  The Petitioner was a high school graduate and served three years in the Army. In addition, trial counsel never testified that they personally perceived that the Petitioner had mental health problems.  Compare Ferrell, 640 F.3d at 1216 (Petitioner's initial trial counsel had "serious questions about [petitioner's] mental health.").

After conducting this investigation, including the interview with Dr. Stark, discussed *infra*, the only evidence that trial counsel had that suggested potential mental health problems was the Petitioner's "Progress Notes" from her voluntary visit to Northeast Georgia Community Mental Health Center in 1995.  (Res. Ex. 99, at 5080-5092.)  The handwritten notes discuss the Petitioner's apparent trouble maintaining her temper with her children and her high level of stress.  (Id. at 5085.)

However, one line of the handwritten notes, not cited by either party, appears to say "3 months ago–had serious suicidal thoughts and plan." (<u>Id.</u> at 5088.) The Petitioner's history would not lead one to suspect that she had mental health problems, as she obtained her high school diploma, was never arrested prior to the murder, and no one in the Petitioner's immediate family had been arrested. "[C]ounsel is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems." <u>Callahan v. Campbell</u>, 427 F.3d 897, 934 (11th Cir. 2005). The Petitioner did not display strong evidence of mental problems of significant relevance on the issue of mitigation, excusing trial counsel from investigating further.

Furthermore, the state habeas court concluded that Dr. Stark did investigate the Petitioner's mental health for potential mitigating issues, and this Court cannot find that the state habeas court's factual conclusion was unreasonable. According to Steve Reilly, Dr. Stark's evaluation did not uncover anything "real helpful." (Res. Ex. 88, at 1684-85.) Trial counsel, interviewed several years after the investigation, was unsure whether Dr. Stark's investigation was limited to determining whether there was a "retardation" or "insanity" defense, or whether it also extended into determining if there were potential mitigating mental health problems. Ed Wilson testified at the state habeas evidentiary hearing, "I'm sure I wanted him to check particularly to see

if there were a retardation defense involved or if there would have been any sort of insanity or any place to go in that. Beyond that I'm not sure if we went any further with that." (Res. Ex. 83, at 61.) Wilson also testified, "[W]e may not have specifically oriented him toward mitigation. I think I primarily had him searching for a defense of either retardation or insanity." (Id. at 90.) Yet, when asked whether he would have considered using a mental health expert in mitigation, he said "yes," and when asked whether he could have asked Dr. Stark to evaluate the Petitioner for mitigation purposes, he said "yes." (Id. at 90-91.) Reilly was also unsure whether Dr. Stark had evaluated the Petitioner for mitigation purposes, testifying, "I know I didn't work with him or supply any information to him in regard to mitigation. I, and again this is my own independent recollection, I think that Ed, during his conversations with Dr. Stark about his assessment of Kelly and his visits with her, I assume and I believe that that covered issues which potentially might have been utilized for mitigation purposes." (Id. at 144-45.) However, Reilly did remember that Dr. Stark concluded that the Petitioner was bi-sexual and that her rejection of this sexual orientation may have been at the root of her infidelity. (Id.); (Res. Ex. 88, at 1760-61.) Such a conclusion is clearly outside of the scope of "retardation" and "insanity." The record is unclear and the Court cannot say that the state habeas court's conclusion was unreasonable. Furthermore, if the state habeas court was unsure whether trial counsel

asked Dr. Stark to investigate mitigating mental health issues, it correctly gave counsel "the benefit of the doubt" that counsel took such action. See Strickland, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance..."); Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."). Even without Dr. Stark's investigation into mental health evidence, but especially with it (and Dr. Stark's failure to uncover anything "real helpful"), the Court cannot find that the state habeas court's determination–that counsel acted reasonably in its investigation of potentially mitigating mental heath evidence–was contrary to, or an unreasonable application of, Supreme Court precedent. "[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Reed v. Secretary, Fla. Dep't of Corr., 593 F.3d 1217, 1242 (11th Cir. 2010). The Court cannot find that the state habeas court unreasonably determined facts or acted contrary to, or unreasonably applied Supreme Court precedent, in concluding that "trial counsel's investigation and presentation of the sentencing phase of Petitioner's case did not constitute deficient performance." (Res. Ex. 123, at 51.)

Even if trial counsel's performance were constitutionally deficient, the state habeas court found that the absence of mitigating evidence of sexual abuse and mental health issues at the sentencing hearing was not prejudicial to the Petitioner. The state habeas court correctly weighed the importance of the new sexual abuse and mental health evidence together in determining that its absence was not prejudicial to the Petitioner, stating, "Even if the Court were to conclude that counsel's performance was deficient, there is not a reasonable probability, that but for this performance, the result of Petitioner's trial would have been different." (Res. Ex. 123, at 52.) Like the state habeas court, this Court will consider the weight of the mitigating evidence of sexual abuse and mental health issues together. The Supreme Court has instructed that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. "In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight." Reed, 593 F.3d at 1240–41 (citing Bobby v. Van Hook, 130 S. Ct. 13, 20 (2009)).

The state habeas court found that there was no prejudice to the Petitioner from the sexual abuse evidence not being raised during the sentencing proceedings, as the evidence presented by habeas counsel was unconvincing. Regarding the sexual abuse evidence, the state habeas court stated that "the allegations of abuse in Petitioner's

background contained in the affidavits presented by *present* counsel are largely uncorroborated. There is no independent documentary evidence such as mental health record, DFACS report, police report, or court record confirming these allegations...some of the evidence of abuse presented to this Court is at best in conflict...the prosecution surely could have challenged this evidence by presenting the testimony of Petitioner's family members." (Res. Ex. 123, at 49-50) (emphasis added). In finding that the Petitioner was not prejudiced by the absence of sexual abuse evidence, the state habeas court distinguished this case from <u>Rompilla</u>, where there was "a wealth of mitigating information" that Rompilla's trial counsel failed to uncover. (<u>Id.</u> at 50.) Here, there was no "smoking gun"; the Petitioner's new evidence was highly contested in the state habeas proceedings. (<u>Id.</u> at 50.) The additional evidence that habeas counsel was able to uncover was not the testimony of individuals who witnessed any of the alleged sexual abuse, but rather individuals testifying that the Petitioner had told them about the abuse. And these claims by the Petitioner tend to grow as her situation becomes more and more desperate. This Court cannot find that the state habeas court made an unreasonable factual determination in concluding that new sexual abuse evidence was unpersuasive.

Also, in concluding that the absence of the sexual abuse testimony and mental health testimony combined was not prejudicial, by inference the state habeas court

could not have found that there was a reasonable probability that the result of the sentencing proceeding would have been different if the Petitioner's new mental health evidence had been presented.[3]   This Court agrees that the Petitioner was not prejudiced by the absence of the new mental health evidence.  The new mental health evidence is unpersuasive.

Dr. Rosenberg bases her report on a social history evaluation that the Court finds to be biased towards uncritical acceptance of the Petitioner's self-reports of traumatic childhood experiences.  The Court does not find this surprising as Dr. Rosenberg was hired by the Petitioner, and has testified for the defense in all of the approximately sixteen to twenty cases in which she has participated.  (Res. Ex. 89, at 1995-97); see Suggs v. McNeill, 609 F.3d 1218, 1230 (11th Cir. 2010) ("[A] reasonable jury is likely to have been highly skeptical of a penalty-phase expert who...testifies in many habeas proceedings and usually...on behalf of the defense.") (internal quotations omitted).  Despite Dr. Rosenberg's statement that she requires both positive and negative reports for her to test the veracity of an individual's statements, the Court strains to see any mention of the Petitioner's positive life events

---

[3]The Petitioner argues that the state habeas court "credited the conclusions of Doctors Bernet, Young, and Rosenberg."  (Petitioner's Br. at 75, n.23.)  The Court does not agree with this conclusion; the state habeas court simply reported their conclusions.

in Dr. Rosenberg's report. Dr. Rosenberg clearly focuses on the Petitioner's negative relationships and exaggerates their importance. For example, Dr. Rosenberg chronicles the negative aspects of the life of the Petitioner's uncle, Eskin Conaway over five pages; she then testified during her deposition that Eskin "was always in [Petitioner's] life until he died." (Res. Ex. 84, at 433-38; Res. Ex. 89, at 2073.) However, Eskin died when the Petitioner was approximately ten years old; furthermore, the Petitioner's mother said that she did not visit Eskin often and the Petitioner's brother recalls going to Eskin's house only once. (Res. Ex. 109, at 8403, 8404; Res. Ex. 106, at 7529.) When compared to Dr. Rosenberg's one paragraph account of the Petitioner's Uncle Barry Don, about whom Dr. Rosenberg was apparently unable to find negative information, Dr. Rosenberg's slant is evident. When faced with conflicting reports, Dr. Rosenberg credits those that portray family members in a negative light and credits those that state that incidents of abuse were more severe. The Court believes that Dr. Rosenberg's report would be unpersuasive to a jury, which would have heard testimony from several family members that would conflict with the report.

Dr. Young concluded that the Petitioner had been experiencing "overwhelming emotional stress and psychological distress" and had suffered from frontal lobe brain damage. (Res. Ex. 84, at 402.) There is no evidence to support the opinion of frontal

lobe brain damage. Dr. Young's opinion about this would not be admissible in a federal trial court under Rule 702 of the Federal Rules of Evidence. The Court is not surprised that a prison inmate that had been sentenced to death would suffer from emotional stress and psychological distress, and this conclusion is not compelling mitigating evidence regarding the Petitioner's state of mind at the time the crime was committed or regarding mental health problems. Furthermore, Dr. Young reached these conclusions in a highly questionable way. Dr. Young used the Rorschach test, which she admitted is considered highly unreliable by the psychiatric community. (Res. Ex. 89, at 1930.) Dr. Young also conceded that she did not have a mechanism to determine that the Petitioner was not malingering during this test. Moreover, Dr. Young did not use an MRI or CAT scan to determine that the Petitioner suffers from frontal lobe damage, but used her subjective testing. Dr. Young also based her conclusions on Dr. Rosenberg's questionable social history evaluation without doing any independent interviews herself. The Court believes that Dr. Young's conclusions would be unpersuasive to a jury.

Dr. Bernet diagnosed the Petitioner with Posttraumatic Stress Disorder ("PTSD"), Cognitive Disorder, Dysthymic Disorder, and dependent, passive and submissive personality traits. (Res. Ex. 84, at 349.) Dr. Bernet concluded that these disorders "would have impaired Ms. Gissendaner's ability to premeditate, deliberate

and carry out the plan that she is alleged to have masterminded" and "that the capacity of Ms. Gissendaner to appreciate the wrongfulness of her behavior or to conform her conduct to the requirements of the law was impaired by the cumulative affect of her mental disorders." (Res. Ex. 84, at 368-69.) Like Dr. Young, Dr. Bernet took Dr. Rosenberg's questionable report at "face value," applying its determinations to make his conclusions without personally verifying its contents. (Res. Ex. 88, at 1826.) Dr. Bernet admitted that if the social history reports that were provided to him were shown to be incorrect that this would "weaken" or "diminish the usefulness" of his evaluation. (Res. Ex. 88, at 1832, 1834.) Furthermore, his conclusion about the Petitioner's inability to "mastermind" the crime is dramatically undercut by his testimony that the only trial testimony he reviewed from the guilt phase was that of Gregory Owen and Laura McDuffie, because he was not "trying to figure out whether or not she actually committed the crime." (Res. Ex. 88, at 1841, 1847.) Furthermore, when confronted with facts tending to show that the Petitioner did have a plan to kill Mr. Gissendaner, Dr. Bernet retreated from his position that the Petitioner could not have planned the murder by saying that "having a bad plan is consistent with a person whose abilities are impaired to some extent." (Res. Ex. 88, at 1850-51.) Dr. Bernet's conclusion that the Petitioner had PTSD is strongly undermined by Dr. Garlick's 2001 conclusion that she did not have PTSD, especially considering that Dr. Bernet spent

far less time with the Petitioner than Dr. Garlick did and Dr. Bernet did not review Dr. Garlick's notes. (Res. Ex. 88, at 1818-1820.) The Court believes that Dr. Bernet's conclusions would be unpersuasive to a jury. The Court finds that even if trial counsel had uncovered all of the new evidence of abuse and all of the new evidence of mental health problems that there is not a "reasonable probability" that the outcome of the sentencing proceeding would have been different. <u>Strickland</u>, 466 U.S. at 695.

### 2. Expert Testimony Challenging the State's Physical Evidence

The Petitioner argues that trial counsel was ineffective in its failure to adequately challenge the State's use of unreliable crime scene, pathology, and DNA evidence. (Petitioner's Br., at 91-92.) The state habeas court found that trial counsel's failure to hire experts to challenge the forensic evidence did not constitute deficient performance. (Res. Ex. 123, at 51-52.) This Court cannot find that the state habeas court's decision was based upon an unreasonable determination of the facts or was contrary to, or an unreasonable application of, Supreme Court precedent.

The Petitioner claims that trial counsel should have hired a crime scene expert, a pathologist, and a DNA expert. The state habeas court reached the factual conclusion that trial counsel did hire Dr. Jung Choi as a DNA expert, which is not an unreasonable determination of fact. (Res. Ex. 123, at 51.) Trial counsel's decision to not utilize Dr. Choi at trial was a strategic decision, which is entitled to great

deference.  See Strickland, 466 U.S. at 690.  Mr. Wilson testified that he felt confident that he could cross-examine the State's pathologist on the pertinent issues, (Res. Ex. 83, at 98), and that he would have hired an independent pathologist if he thought that one was needed.  (Res. Ex. 88, at 1694.)  Again, trial counsel made a strategic decision not to retain a pathologist.  Trial counsel hired an investigator, Dennis Miller, who visited the crime scene several times with trial counsel, and who reviewed the physical evidence.  The Petitioner argues that a crime scene expert and pathologist would have determined that the murder of Mr. Gissendaner did not occur the way that the State portrayed it during trial, and necessarily involved the participation of a third party.  Trial counsel's strategic decision to abstain from hiring a crime scene expert and pathologist was reasonable, as the State never contended that the Petitioner participated in the actual killing or was present when the kidnaping or murder took place.  (Res. Ex. 123, at 51.)  Furthermore, "[e]ven if such experts had been retained by trial counsel, the key fact of the State's case would remain unchallenged: that Greg Owen killed the Victim at the request of Petitioner."  (Id.)  Knowing this, it was reasonable to think that such an investigation would have been a waste of trial counsel's resources; furthermore, the Court's prejudice evaluation concludes that habeas counsel did not present any evidence in the habeas evidentiary hearing that demonstrated that such an investigation would have been worthwhile.

The new crime scene and DNA evidence presented by habeas counsel would not have changed the outcome of the Petitioner's trial, and thus its absence was not prejudicial. The state habeas court stated that "[t]he testimony of such experts would not have reduced or mitigated Petitioner's role in the crime even if such evidence had established the involvement of a third party." (Res. Ex. 123, at 51.) The claim that a third party assisted Owen in the murder is even more improbable than Owen's original story. The state habeas court's legal conclusion is not contrary to, or an unreasonable application of, Supreme Court precedent.

### 3.    Trial Counsel's Challenge to Greg Owen's Testimony

The Petitioner argues in her Amended Petition, and implies in the prosecutorial misconduct section of her brief (but does not present an argument in the ineffectiveness of counsel portion of her brief), that trial counsel failed to adequately challenge Greg Owen's testimony. The state habeas court found that trial counsel was not deficient in challenging Owen's testimony, and this Court does not find that conclusion to be an unreasonable determination of the facts or contrary to, or an unreasonable application of, Supreme Court precedent.

Trial counsel's performance in this area was not deficient. As determined by the state habeas court, trial counsel was able to elicit the following inconsistent facts in Owen's testimony on cross-examination: "Owen originally lied to police regarding

his whereabouts on the night of the murder"; "Owen admitted he did not implicate Petitioner in the murder until after the police had informed him that she was also seeing other men"; "Owen repeatedly told police that Petitioner had not come to the scene of her husband's murder and did not testify at his plea hearing that Petitioner was at the scene of the murder on the night of the crime"; "What Owen did with the murder weapon, his clothes and several personal items"; "That Owen lied to police when he had informed them that he drove around after killing the Victim waiting for Petitioner to page him."  (Res. Ex. 123, at 47-48.)  The state habeas court's factual determination that the above inconsistencies were brought out by trial counsel is reasonable.  The legal conclusion that trial counsel was not ineffective because he failed to impeach Owen on other inconsistencies is not contrary to, or an unreasonable application of, Supreme Court precedent.

Even if trial counsel's performance were deficient, the Petitioner was not prejudiced.  The state habeas court concluded: "Even if the Court found trial counsel's performance to be deficient in failing to elicit all inconsistencies in Owen's testimony, there is no evidence that the additional inconsistencies cited by Petitioner would have made a difference in the outcome of the case, particularly given the number and relevance of the inconsistencies trial counsel did elicit."  (Res. Ex. 123, at 48.)  This Court cannot find the state habeas court's conclusion to be unreasonable as to the facts

or to be contrary to, or an unreasonable application of, Supreme Court precedent.

B.     Prosecutorial Misconduct

The Petitioner alleges that the state prosecution team suppressed material exculpatory evidence, presented false evidence, and manufactured evidence for use against the Petitioner at trial, in violation of the United States Constitution, as enunciated specifically in Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). The state habeas court denied the Petitioner relief on these claims, and this Court cannot find that the state habeas court unreasonably determined facts or reached conclusions that were contrary to, or an unreasonable application of, Supreme Court precedent.

1.     Brady

Due process is violated when the prosecution suppresses evidence, irrespective of good or bad faith, that is favorable to the defense and material to the defendant's guilt or punishment. Brady, 373 U.S. at 87. The standard for analyzing whether the state violated Brady was correctly recited by the state habeas court as follows:

> A Brady violation has four main parts: 1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it [herself] with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

(Res. Ex. 123, at 22.)

The Petitioner argues that the state prosecutors violated <u>Brady</u> by proposing to Owen that he testify that the Petitioner went with him to the crime scene. During the October 21, 1998 interview with the prosecution team, Owen stated for the first time that the Petitioner came to the crime scene on the night of the murder. Previously during the same interview, and on several prior occasions, Owen claimed that the Petitioner had not come to the crime scene. Assistant District Attorney George Hutchinson's notes from that interview contain the phrase "why not tell defendant there" (Res. Ex. 85, at 723), with a question mark indicating that one of the prosecutors asked the question, and marked with an arrow because it was "something that seemed of significance." (Res. Ex. 83, at 257-58.) On the next page of the notes, there is the first recorded mention of Owen stating that the Petitioner was indeed at the scene of the crime on the night of the murder. (Res. Ex. 83, at 256.)

The Petitioner argues that Hutchinson's notes provide proof that state prosecutors prompted Owen to testify that the Petitioner was at the crime scene. All three members of the state prosecution team, Assistant District Attorney Nancy Dupree (Res. Ex. 83, at 224), Chief Assistant District Attorney Phil Wiley (Res. Ex. 83, at 242), and Hutchinson (Res. Ex. 83, at 259), testified at the habeas evidentiary hearing that they never suggested to Owen that he should make the Petitioner appear to be more culpable in the crime. The state habeas court determined that Hutchinson's

note "why not tell defendant there?" did not prove that prosecutors influenced Owen to change his testimony.[4]   The Court is unable to find the state habeas court's conclusion to be an unreasonable determination of fact.

The Petitioner also argues that state prosecutors violated <u>Brady</u> when they did not provide the Petitioner with their handwritten notes from an October 21, 1998 interview with Owen.  Prosecutors did provide the Petitioner with a typed summary of the interview.  The Petitioner contends that this summary was inadequate, as it lacked the following statements from Owen: The Petitioner provided the accelerant Owen used to burn the victim's car after Owen brought the accelerant from his house and put it in the Petitioner's car; the accelerant was kerosene, not gasoline; the Petitioner drove Owen to the crime scene prior to the murder; the Petitioner gave

---

[4]The state habeas court reasoned:

Owen changed his story to put the Petitioner at the scene of the actual murder viewing the body.  Petitioner has been unable to establish who, if anyone, actually said this phrase in the interview of Owen.  Petitioner has failed to show a context in which the phrase would influence Owen to change his testimony.  Petitioner's interpretation of the summary and the prosecutor's note is not reasonable.  In fact, although Owen seeks to recant some of his trial testimony in this proceeding, even he still maintains that no one told him to change his story, but that he did it based on what he believed "they wanted to hear.". (sic) Accordingly, the Court finds no <u>Brady</u> violation with respect to the alleged "prompting."

(Res. Ex. 123, at 24-25.)

Owen the knife and night stick from the trunk of her car instead of from under her seat; the Petitioner handed Owen the kerosene rather than throwing it out of the window; and Owen put the murder weapons, victim's possessions, and his own clothes in a trash bag and discarded them a week after the crime. (Res. Ex. 85 at 712-24.)

In order to demonstrate a <u>Brady</u> violation, the Petitioner must show that the suppressed evidence was material, i.e., there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). The state habeas court found that the handwritten notes were improperly withheld, but that the evidence would not have made a difference in the outcome of the case. (Res. Ex. 123, at 26.) As the state habeas court was aware, it should have ruled for the Petitioner if it had found that there was a reasonable likelihood that if the withheld information had been provided that the result of the guilt phase or the sentencing phase would have been different. (Res. Ex. 123, at 25); <u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995). A reasonable likelihood "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." <u>Id.</u> (citing <u>Bagley</u>, 473 U.S. at 682). When considering the materiality of withheld evidence, all of the evidence should be considered collectively

and not item by item.  <u>Kyles</u>, 514 U.S. at 436.  The state habeas court denied the

Petitioner's <u>Brady</u> claim because it did not believe that the withheld evidence was

collectively material.  This Court does not find that the state habeas court's finding

was contrary to, or an unreasonable application of, Supreme Court precedent.

Owen testified at trial and at the state habeas evidentiary hearing that the

Petitioner had the kerosene with her in her car when she came to the crime scene.

(Res. Ex. 35, at 2304-06; Res. Ex. 83, at 32.)  The typed summary of the October 21,

1998 interview also includes Owen stating the same fact, but omits that Owen said

that he brought the kerosene from his home and put it in the Petitioner's car

beforehand.  This statement can only be found in the prosecution team's handwritten

notes.  (Res. Ex. 85, at 727.)  The state habeas court found this evidence to be

immaterial because the accelerant "was not used in the actual killing or in furtherance

of any aggravating factor."  (Res. Ex. 123, at 23-24.)

However, the state habeas court did find that the notes regarding the accelerant

could have been used to impeach Owen.  The state habeas court also found that the

notes stating that the accelerant was kerosene rather than gasoline, and that the

Petitioner drove Owen to the crime scene prior to the murder,[5] could have been used

---

[5]While this statement could have been used against Owen for impeachment
purposes, it was also inculpatory for the Petitioner.

to impeach. (Res. Ex. 123, at 23-24.) Suppressed favorable evidence can be either impeaching or exculpatory; the state habeas court found the evidence regarding the Petitioner's presence at the crime scene and the origin of the accelerant to be impeaching only.[6] (Res. Ex. 123, at 22); Brady, 373 U.S. at 88; Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Nonetheless, the state habeas court did not find that this impeaching evidence would have had a reasonable likelihood of changing the result. The state habeas court reasoned that defense counsel brought to the jury's attention many inconsistencies in Owen's trial testimony, making further impeachment less vital, and that the prosecution presented a myriad of evidence in addition to Owen's testimony that tended to show the Petitioner's guilt. (Res. Ex. 123, at 25-26.) This Court does not find the state habeas court's determination that the withheld evidence was immaterial to be unreasonable factually, or contrary to, or an unreasonable application of, Supreme Court precedent.

      2.    Giglio

The Petitioner also argues that the prosecution presented Owen's testimony knowing that parts of it were false, in violation of Giglio v. United States, 405 U.S. 150 (1972). The standard for establishing a Giglio claim was correctly laid out by the

---

[6]The state habeas court found the other withheld evidence from the notes listed above to be neither impeaching nor exculpatory.

state habeas court as follows: "Petitioner must establish that Owen's testimony was false; that the prosecution knew or should have known that the testimony was false; and that the false testimony was material." (Res. Ex. 123, at 26) (citing Jacobs v. Singletary, 952 F.2d 1282, 1287 (11th Cir. 1992)). The state habeas court determined that the Petitioner did not prove a Giglio violation. The state habeas court's discussion of this claim was based on two grounds: 1) the Petitioner did not establish that Owen's trial testimony was false, and 2) there was no evidence that the prosecution knew Owen's testimony was false. The state habeas court did not address whether the testimony at issue was material.[7]

Owen's story of the events in question changed several times over the course of his many interviews with the prosecution, his testimony at trial, and his testimony at the state habeas court. The state habeas court, faced with fluctuating testimony, was charged with determining which version of Owen's testimony was the truth. The state habeas court appears to quickly dismiss Owen's versions of the story not told in a court under oath, but still confronts significant factual differences between the stories told by Owen at trial and those told at the habeas evidentiary hearing. The most

---

[7]The materiality standard of a Giglio claim is more easily satisfied than for other Brady claims. For a Giglio violation, a petitioner need only show that if not for the error there was "any reasonable likelihood" that the result of the guilt phase or sentencing phase would have been different. Ventura v. Attorney General, Fla., 419 F.3d 1269, 1278 (11th Cir. 2005).

significant differences are:

> Owen now maintains that he testified falsely at trial. He now maintains that: 1) Ms. Gissendaner did not supply the knife; 2) she was not involved in the planning of the actual killing; 3) Owen had the help of a third person whom he recruited in the abduction and killing; 4) Ms. Gissendaner did not know the third person was involved; and 5) Ms. Gissendaner never went to the murder scene to ensure her husband was dead.

(Res. Ex. 123, at 27.)

The state habeas court held that Owen's potential recantation at the habeas evidentiary hearing did not prove his trial testimony was false, and thus that the Petitioner failed to establish prong 1 of the <u>Giglio</u>/<u>Jacobs</u> test. The state habeas court reasoned: "The Georgia Supreme Court gives more credit to trial testimony than to post trial recantations." (Res. Ex. 123, at 27.) The state habeas court quotes <u>Norwood v. State</u>, 273 Ga. 352 (2001):

> That a material witness for the State, who at the trial gave direct evidence tending strongly to show the defendant's guilt, has since the trial made statements even under oath that his former testimony was false, is not cause for a new trial. Declarations made after the trial are entitled to much less regard than sworn testimony delivered at the trial. ... The only exception to the rule against setting aside a verdict without proof of a material witness' conviction for perjury, is where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication. <u>Fugitt v. State</u>, 251 Ga. 451(1), 307 S.E.2d 471 (1983). A recantation impeaches the witness' prior testimony. However, it is not the kind of evidence that proves the witness' previous testimony was the purest fabrication.

<u>Norwood</u>, 273 Ga. at 353.

The state habeas court applied the Norwood standard and found that the Petitioner did not prove that Owen's trial testimony "'was in every material part' 'purest fabrication' or, in other words, prove[] that his testimony was impossible." (Res. Ex. 123, at 27.) Specifically, the state habeas court found that "[t]here is no evidence that it was impossible for Petitioner to give Owen the murder weapon, no evidence that it was impossible for Petitioner to have come to the scene of the crime, and no evidence that it was impossible for Owen to have committed this crime without the assistance of an alleged 'third' person....The Court finds [the testimony at the habeas evidentiary hearing] to be one more story told by a witness prone to telling multiple stories." (Res. Ex. 123, at 27-28.)

The Petitioner argues that the state habeas court misapplied United States Supreme Court law by looking to Georgia law for the standard for determining whether the trial version or habeas evidentiary hearing version was the truth, when "the proper standard for consideration of the federal false testimony claim is set forth in Giglio and Napue." (Petitioner's Br., at 222.) The Petitioner does not clarify what that standard is, however, and the Court is unable to determine how those cases provide guidance for a court attempting to decipher whether a recantation proves trial testimony to be false. In neither Giglio nor Napue v. People of State of Ill., 360 U.S. 264 (1959), does the Court struggle to determine the truth between conflicting

testimony, and in neither case does the Court articulate a standard for determining the truth. In Giglio, after the government's principal witness testified that he was given no assurances that he would not be prosecuted in return for testifying, a government prosecutor admitted in an affidavit that he had made such a promise to the witness. The Court does not question the truth of the prosecutor's affidavit. In Napue, similarly, there is no real question about whether the witness testified falsely–the second sentence of the opinion already alludes to the "witness' false testimony." In both cases the State admitted that the trial testimony was false. The Court is not forced to resolve difficult factual questions in either case, and does not provide guidance for how to solve the type of problem presented here. Thus, the state habeas court did not act contrary to, or misapply, Supreme Court precedent by searching for guidance from the Georgia Supreme Court on how to resolve the factual conflict before it.

The state habeas court did not misapply Supreme Court precedent by applying Norwood to determine the factual conflict before it. In applying Norwood, the state habeas court was not unreasonable in concluding that the Petitioner had not proven the trial testimony to be false. Nothing that Owen said at the habeas evidentiary hearing made his testimony at the trial impossible. As the state habeas court wrote, the habeas testimony was simply "one more story told by a witness prone to telling

multiple stories." (Res. Ex. 123, at 28.) The state habeas court also made the factual

finding that "there is no evidence before this Court to support the allegations that the

prosecutors knew the testimony was false." (Id.) This Court cannot find that factual

finding to be unreasonable. In denying the Petitioner's <u>Gigilio</u> claim, the state habeas

court did not unreasonably determine the facts, or act contrary to, or unreasonably

apply, Supreme Court precedent. Indeed, this Court recognizes that the story told by

Owen in the evidentiary hearing is even more improbable than the story he told at the

trial.

      C.    <u>Proportionality of the Death Sentence</u>

Pursuant to O.C.G.A. § 17-10-35, the Supreme Court of Georgia reviews all

death sentences to determine whether the sentence is "excessive or disproportionate

to the penalty imposed in similar cases, considering both the crime and the defendant."

O.C.G.A. § 17-10-35(c)(3). The Petitioner says that her sentence is disproportionate

and that the Georgia Supreme Court conducted an inadequate and "perfunctory"

proportionality review. (Petitioner's Br., at 229.) The Petitioner does not have a

constitutional right to a proportionality review. <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 46-

51 (1984); <u>Barbour v. Haley</u>, 471 F.3d 1222, 1231 (11th Cir. 2006). Moreover, the

Eleventh Circuit has explicitly stated that district courts should not review the state

supreme court's proportionality review. <u>Mills v. Singletary</u>, 161 F.3d 1273, 1282 n.9

(11th Cir. 1998) (citing <u>Moore v. Balkcom</u>, 716 F.2d 1511, 1518 (11th Cir. 1983) ("A federal habeas court should not undertake a review of the state supreme court's proportionality review...)).  Thus, the Court will not do so here.

D.  <u>Actual Innocence</u>

The Petitioner argues that she is not guilty of the crime of malice murder, and seeks this Court's review of the Georgia Supreme Court's ruling upholding her guilty verdict.[8]  The standard for demonstrating innocence before a habeas court is very high. Having been previously found guilty beyond a reasonable doubt, she "no longer has the benefit of the presumption of innocence."  <u>Schlup v. Delo</u>, 513 U.S. 298, 326 (1995).  She must establish:

> that no reasonable juror would have found the defendant guilty.  It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light

---

[8]This Court disagrees with the Petitioner's assessment that the Georgia Supreme Court did not rule on whether the Petitioner was guilty, and agrees with the state habeas court that "[the] claim was raised and decided adversely to Petitioner on direct appeal in [the Georgia Supreme Court]."  (Res. Ex. 123, at 8.)  The Georgia Supreme Court held: "Viewed in the light most favorable to the verdict, we find that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Gissendaner was guilty of the crimes of which she was convicted and that statutory aggravating circumstances existed."  <u>Gissendaner</u>, 272 Ga. at 705.

of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

Id. at 329. In addition, she must allege a cognizable constitutional error. Id. at 321; Murray v. Carrier, 477 U.S. 478, 496 (1986). As discussed in the other sections of this Order, the Petitioner has not presented a cognizable claim of a constitutional violation. Furthermore, the Petitioner has not demonstrated that she is innocent. Therefore, the Petitioner cannot make a successful claim for actual innocence before this Court and also cannot meet the extremely high standard of showing a miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 336 (1992); [Doc. 39, at 11-13].

    E.    Jury Selection

This Court found the Petitioner's clam that the grand jury was discriminatorily selected to be procedurally defaulted [Doc. 39, at 16]. This Court also found the Petitioner's claim that the grand jury foreman was selected discriminatorily to be procedurally defaulted [Doc. 39, at 16]. Moreover, the discriminatory selection of a grand jury foreman does not threaten a defendant's constitutional rights, as the position is "ministerial," and thus cannot provide a basis for habeas relief. Hobby v. United States, 468 U.S. 339, 344-45 (1984); Ingram v. State, 253 Ga. 622, 627 (1984). The Court also found that the Petitioner had procedurally defaulted her claim that the jury pools from which the grand and traverse juries were selected had violated her constitutional rights. [Doc. 39, at 16]. The Petitioner has not provided an argument

showing cause and prejudice or a miscarriage of justice to overcome the default of any of these claims. Furthermore, the Petitioner has not proved the selection of the jury pools violated the United States Constitution. See Duren v. Missouri, 439 U.S. 357, 364 (1979) (stating the requirements to prevail on a Sixth Amendment jury pool composition challenge); Castaneda v. Partida, 430 U.S. 482, 494 (1977) (stating the requirements to prevail on a Fourteenth Amendment jury pool composition challenge).

The Petitioner also claims that the jury commission which selected the traverse jury was unconstitutionally comprised because it contained five rather than six members. The Court has no evidence before it substantiating the Petitioner's claim that there were only five members on the jury commission. Furthermore, the Petitioner states that this is a violation of O.C.G.A. § 15-12-20, but does not state how a five-member jury commission offends the United States Constitution.[9]

F.      Jury Charge

The Petitioner argues that she was denied a fair capital sentencing proceeding, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, when the trial court refused to instruct the jury that their failure to reach a unanimous decision would automatically lead to a sentence of life

---

[9]The Georgia Supreme Court recently rejected the claim that a five-member jury commission violates the United States Constitution. Foster v. State, 288 Ga. 98, 101 (2010).

imprisonment.[10]  The trial judge instructed the jury that their "verdict as to penalty must be unanimous."  (Res. Ex. 38, at 2906.)  The trial judge did not instruct the jury that their inability to reach a unanimous verdict would ultimately result in the jury's dismissal and the judge imposing a sentence of either life imprisonment or imprisonment for life without parole.  O.C.G.A. § 17-10-31(c).  The Petitioner argues that the judge misled the jury by telling them their verdict had to be unanimous when in practice had one of the members of the jury refused to vote for the death penalty, the Petitioner could not have been sentenced to death.  The Respondent counters that the judge did not mislead the jury because he told the truth; the jury had to reach a unanimous verdict or the jury would have been dismissed and the judge would have imposed the sentence.

The Court agrees that the judge did not improperly instruct the jury.  Furthermore, the Court does not believe that the trial judge was required to augment his instructions by notifying the jury as to what would happen if the jury failed to reach a unanimous verdict and had to be dismissed in favor of a judge-imposed sentence.  The judge is not required to inform the jury as to all of the ramifications of their decision, see, e.g., United States v. Muentes, 316 Fed. Appx. 921, 926 (11th Cir.

---

[10]Because this claim was not considered by the Georgia Supreme Court on direct appeal or by the state habeas court, this Court reviews this claim *de novo*. Cone v. Bell, 556 U.S. 449 (2009).

2009) ("A defendant is not entitled to an instruction informing the jury of the consequence of a guilt or innocence finding in terms of punishment"), or even all of their options. For example, the judge is allowed to instruct the jury to convict a defendant if they find proof that the defendant is guilty beyond a reasonable doubt, thereby impliedly foreclosing their ability to exercise jury nullification. See, e.g., United States v. Trujillo, 714 F.2d 102, 105-06 (11th Cir. 1983); United States v. Carr, 424 F.3d 213, 218-20 (2d Cir. 2005) ("[A] trial court is not required to inform a jury of its power to nullify."). Just like jury nullification, the power of an individual juror to force a judge-imposed sentence is not "something that a judge should encourage or permit if it is within his authority to prevent." Carr, 424 F.3d at 220 (quoting United States v. Thomas, 116 F.3d 606, 615 (2d Cir. 1997)).

The Petitioner also argues that the jury charge was deficient because the trial court "gave a general charge that failed to inform the jury on the true nature of mitigation evidence." (Petitioner's Br., at 272.) Specifically, the Petitioner argues that "the jurors did not understand the meaning of the term 'mitigating'" because the trial court refused to charge on "specific examples of applicable mitigating circumstances," and that "the court instructed the jury that in its consideration of mitigating evidence they were entitled to consider childhood, general upbringing, emotional disturbance, and youth," and by "listing...only a few potential areas of

mitigation naturally limited the jury's consideration in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Petitioner's Br., at 272-73.)

The trial court explained "mitigating" evidence to the jury to clear up confusion:

> Mitigating or extenuating circumstances are those which you, the jury, find do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame.

(Res. Ex. 38, at 2901.) This explanation was sufficient and did not have to be buttressed with specific examples of mitigating circumstances. In addition, the Petitioner argues that by giving only a few examples of mitigating circumstances, the court misled the jury into thinking these were the only possible mitigating circumstances. "[T]he Eighth and Fourteenth Amendments require that the sentence[r]...not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). Other examples of mitigating circumstances exist besides those enumerated by the trial court.[11] However, this Court cannot find that the Georgia

---

[11]For example, the defendant's adjustment to prison life may be properly considered by the jury as mitigating evidence. Skipper v. South Carolina, 476 U.S.

Supreme Court's conclusion that the charge on mitigating circumstances was not misleading to the jury to be contrary to, or an unreasonable application of, Supreme Court precedent, or to be an unreasonable determination of fact. <u>Gissendaner</u>, 272 Ga. at 715.

Also, similar to the Petitioner's argument that the jurors should have been instructed that they were not required to reach a unanimous decision on sentencing, the Petitioner argues that the jurors should have been instructed to consider the mitigating circumstances individually. (Petitioner's Br., at 273.) The Petitioner cites <u>Mills v. Maryland</u>, 486 U.S. 367 (1988), which held that the trial court committed error when its instructions led the jurors to believe that they were required to agree unanimously on the existence of a particular mitigating factor before that mitigating factor could be considered in sentencing. <u>Id.</u> at 377-78. <u>Mills</u> does not hold that the trial court is required to instruct jurors to consider mitigating circumstances individually. Instructing jurors that they must agree on a particular mitigating factor and refraining from stating that each juror must consider mitigating factors individually is not synonymous; <u>Mills</u> is distinguishable from the present case. Also distinguishable is that the Maryland statute in <u>Mills</u> required the imposition of the death penalty if the jury agreed that there was a statutory aggravating factor and did

1, 7 (1986).

not agree on a mitigating factor.  Id. at 367.  In the present case, the trial judge instructed, "you may set the penalty to be imposed at life imprisonment.  It is not required and it is not necessary that you find any extenuating or mitigating fact or circumstance in order for you to direct a verdict setting the penalty to be imposed at life imprisonment." (Res. Ex. 38, at 2903-04.)  Therefore, even if a juror erroneously believed that he could not establish a mitigating fact or circumstance if it was not agreed to by all other jurors, he was aware that he could recommend a sentence of life imprisonment regardless.  On this issue the Georgia Supreme Court held: "It was not necessary for the trial court to charge the jury that findings regarding mitigating circumstances need not be unanimous or on how mitigating circumstances should be weighed, because the trial court properly charged the jury that it was not necessary to find any mitigating circumstances in order to return a sentence less than death." Gissendaner, 272 Ga. at 716.  The Georgia Supreme Court did not rule contrary to, or unreasonably apply, United States Supreme Court precedent.

G.     Georgia's Death Penalty Scheme

The Petitioner argues that Georgia's capital punishment regime is unconstitutional because it "provides no uniform sentencing standards for determining when such sentences are appropriate, and a scheme that affords district attorneys the plenary power to seek sentences of death based on whim alone."  (Petitioner's Br., at

277.)  Georgia's death penalty scheme was expressly upheld by the United States Supreme Court in <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976).  In <u>Gregg</u>, the Court found that Georgia's capital punishment scheme[12] controls the discretion exercised by the jury "by clear and objective standards so as to produce non-discriminatory application."  <u>Id.</u> at 198; <u>see also</u> <u>Crowe v. Terry</u>, 426 F. Supp. 2d 1310, 1355 (N.D. Ga. 2005) (holding that <u>Gregg</u> "expressly upheld Georgia's system of imposing the death penalty").  The Petitioner's argument that <u>Bush v. Gore</u>, 531 U.S. 98 (2000), renders Georgia's death penalty scheme unconstitutional is unpersuasive and has already been rejected by this Court.  <u>Crowe</u>, 426 F. Supp. 2d at 1354-55.

The Petitioner also argues that district attorneys use an arbitrary process for deciding whether to seek the death penalty which violates the United States and Georgia Constitutions.  This claim also fails.  The Eleventh Circuit recently held that a petitioner cannot argue that the death penalty process violates the Equal Protection Clause of the Fourteenth Amendment unless she can establish a *prima facie* case of

---

[12]The <u>Gregg</u> Court highlights that the jury must find one of the statutory aggravating circumstances to exist beyond a reasonable doubt, that the jury is authorized to consider mitigating circumstances, and that the jury is not required to find any mitigating circumstance before recommending a sentence other than death. <u>Gregg</u>, 428 U.S. at 196-97. The Court also highlights that Georgia now bifurcates the guilt and sentencing phase, and that there is an automatic appeal of all death sentences to the Georgia Supreme Court, which is "an important additional safeguard against arbitrariness and caprice." <u>Id.</u> at 198.

intentional discrimination against a protected class.  Wellons v. Hall, 554 F.3d 923, 942 n.9 (11th Cir. 2009), vacated on other grounds, Wellons v. Hall, 130 S. Ct. 727 (2010).  The Petitioner does not make a *prima facie* case of intentional discrimination although she makes some unsubstantiated claims that the defendant's low socio-economic status and the race of the victim can sometimes play a role.[13]  Furthermore, the United States Supreme Court has stated that "[i]mplementation of [criminal laws against murder] requires discretionary judgments," and that "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused."  McCleskey v. Kemp, 481 U.S. 279, 297 (1987).  The Petitioner did not provide "exceptionally clear proof" that state prosecutors abused their discretion in seeking the death penalty against the Petitioner.  Therefore, the Petitioner has failed to prove that the Georgia Supreme Court's decision was contrary to, or an unreasonable application of, Supreme Court precedent.

---

[13]The Petitioner states that "those convicted of killing white persons are far more likely to receive the death penalty than those who kill non-white persons." (Petitioner's Br., at 282-83.)  However, she admits that the Court ruled adversely in McCleskey v. Kemp, 481 U.S. 279 (1987), when it allowed Georgia to continue executions even though a person was four times more likely to be sentenced to death if the victim was white than if the victim was African-American.  Moreover, persons who murder white persons are of course not a protected class under the Equal Protection Clause.

H.     Victim Impact Evidence

The Petitioner argues that the trial court erred in admitting victim impact evidence. However, the Supreme Court has held that the Eighth Amendment does not create a *per se* bar to the admission of victim impact evidence and that there is no reason to treat this evidence differently than other relevant evidence. Payne v. Tennessee, 501 U.S. 808, 827 (1991). The victim impact evidence presented in this case described the loss felt by those close to the victim, particularly his three children. (Res. Ex. 37, at 2797-2806.) This evidence was not "so unduly prejudicial that it render[ed] the trial fundamentally unfair[.]" Payne, 501 U.S. at 825. The Georgia Supreme Court's decision denying this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

I.     Photographic and Video Evidence

The Petitioner claims that the trial court erred in admitting photographs and a video of the crime scene and the victim. (Petitioner's Br., at 292.) The Petitioner argues that these photographs were prejudicial and irrelevant. "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions in the admission of evidence." Osborne v. Wainwright, 720 F.2d 1237, 1238 (11th Cir. 1983) (citing Lisenba v. California, 314 U.S. 219, 228 (1941)). Yet, "the federal court [in a habeas corpus proceeding] will make inquiry only to determine whether the error

was of such magnitude as to deny fundamental fairness to the criminal trial....The admission of prejudicial evidence justifies habeas corpus relief only if the evidence is material in the sense of a crucial, critical, highly significant factor." Osborne, 720 F.2d at 1238 (internal citations and quotations omitted). The Respondent argues: "The photographs and the video were relevant and admissible to show the nature and location of the victim's wounds, the location and position of the body, the location of the body in relation to the crime scene, and the appearance of the body at the time of the autopsy. Furthermore, the autopsy photographs were properly admitted to assist the medical examiner in describing the cause and manner of death." (Respondent's Br., at 199.) The photographs also show that the Petitioner knowingly abandoned her husband's body in a wooded area where animals chewed off part of his face before the body was found. The Court does not believe that the introduction of the photographic and video evidence denied the Petitioner "a fundamentally fair trial" in violation of the Fourteenth Amendment's Due Process Clause. Osborne, 720 F.2d at 1238.

> J.      Lethal Injection

The Petitioner argues that Georgia's lethal injection procedure is cruel and unusual punishment in violation of the Eighth Amendment. As a threshold matter, the Respondent argues that this Court cannot review this claim on a habeas petition. The Court is unconvinced. The Respondent cites Tompkins v. Secretary, Dep't of Corr.,

557 F.3d 1257 (11th Cir. 2009), for the proposition that "[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures." Id. at 1261. While this language appears to be dispositive of the issue on its face, after closer examination the Court believes that a petitioner's first habeas petition is an appropriate vehicle through which to bring a challenge to a lethal injection procedure. First, the facts of Tompkins are distinguishable from the case at bar. Tompkins did not raise the lethal injection claim in his first habeas petition, which was filed in 1989, because the state did not use that method of execution at that time. Id. However, the state adopted lethal injection as an execution method in 2000, and the court notes that "Tompkins could have filed a 42 U.S.C. § 1983 lawsuit challenging the method and procedures at any time during the eight years since then." Id. The Tompkins court was responding to a petitioner who had brought a *second or successive* habeas petition, and had delayed eight years since the change in the state's lethal injection procedures to do so.

On the other hand, Nelson v. Campbell, 541 U.S. 637 (2004), states that "method-of-execution challenges [ ] fall at the margins of habeas," which suggests that such claims can be brought in habeas. Id. at 646. Furthermore, in a habeas appeal decided by the Eleventh Circuit in the same year as Tompkins, the Eleventh Circuit reached the merits of a claim challenging lethal injection procedures, lending further

credence to this Court's suspicion that the <u>Tompkins</u> language was inaccurately broad. <u>See</u> <u>Wellons</u>, 554 F.3d at 942. Additionally, from a policy perspective, the Court believes that judicial economy is best served by allowing a petitioner to bring a claim challenging lethal injection procedures in her habeas petition rather than requiring her to separately file a § 1983 action.

The Court considers the Petitioner's claim *de novo*, as it was raised before the state habeas court, which refused to decide it. Reaching the merits of the Petitioner's lethal injection claim, however, the Court is quickly struck by the weight of the case law against the Petitioner's argument. The Supreme Court found that a similar three-drug lethal injection protocol did not violate the Eighth Amendment. <u>Wellons</u>, 554 F.3d at 942 (citing <u>Baze v. Rees</u>, 553 U.S. 35 (2008)). Since <u>Baze</u>, Georgia has not significantly altered its method of execution. Georgia now uses pentobarbital instead of sodium penthotal as the first of its three drugs;[14] the Eleventh Circuit has consistently found that this switch did not offend the Eighth Amendment. <u>See</u> <u>Powell v. Thomas</u>, 641 F.3d 1255 (11th Cir. 2011); <u>DeYoung v. Owens</u>, 2011 U.S. App. LEXIS 15794 (11th Cir. July 20, 2011). Georgia's lethal injection procedure does not violate the United States Constitution.

---

[14]The purpose of the first of the three drugs is to render the individual unconscious. <u>See</u> <u>Baze</u>, 553 U.S. at 49.

## IV.  Conclusion

For the reasons set forth above, the Court DENIES the Amended Petition for

Writ of Habeas Corpus [Doc. 16].

SO ORDERED, this 21 day of March, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge