IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KELLY RENEE GISSENDANER,

   Petitioner,

     v.

KATHY SEABOLT
Warden, Metro State Prison,

   Respondent.

CIVIL ACTION FILE
NO. 1:09-CV-69-TWT

ORDER

This is a habeas corpus action arising out of a state death penalty case. It is before the Court on the Petitioner's Motion to Alter or Amend the Clerk's Judgment [Doc. 69]. For the reasons set forth below, the Petitioner's Motion is DENIED.

I. Background

Petitioner Kelly Gissendaner and her co-defendant Gregory Owen were indicted in the Superior Court of Gwinnett County on May 1, 1997, on one count of malice murder and one count of felony murder. The State filed its notice of intent to seek the death penalty against the Petitioner on May 6, 1997. Following a jury trial, the Petitioner was convicted of malice murder. The Georgia Supreme Court summarized the facts of her case as follows:

Gissendaner and the victim had been married, divorced, remarried, separated, and reunited between 1989 and 1997. Ms. Gissendaner was in a relationship with Gregory Bruce Owen and at one point stated to a coworker that she was unhappy with her husband and in love with Owen.

Prior to Gissendaner's trial, Owen entered an agreement not to seek parole within 25 years, pled guilty, and received a sentence of life in prison. Owen testified at Gissendaner's trial that it was she who first raised the idea of murder and that she later raised the idea again several other times. Owen suggested divorce as an alternative, but Gissendaner insisted upon murder because she believed she would receive insurance money from her husband's death and because she believed he "wouldn't leave [her] alone by just divorcing him." Gissendaner had previously stated to Owen's sister that she intended to use the victim's credit to get a house and then "get rid of him."

During the days leading up to the murder, Gissendaner made 47 telephone calls to Owen and paged him 18 times. Telephone records also showed that the pair were together at a bank of payphones several hours before the murder. On the evening of February 7, 1997, Gissendaner drove Owen to her family's home, gave him a nightstick and a large knife, and left him inside the home to wait for the victim. Gissendaner then drove to a friend's house, and, upon Gissendaner's insistence that the group keep their plans for the evening, she and her friends went out to a nightclub.

The victim arrived home shortly after 10:00 p.m. Owen confronted the victim from behind, held a knife to his throat, forced him to drive to a remote location, forced him to walk into the woods and kneel, and then killed him by striking him with the nightstick and then stabbing him repeatedly in the back and neck with the knife. As instructed by Gissendaner, Owen took the victim's watch and wedding ring before killing him to make the murder appear like a robbery.

Gissendaner returned home from the nightclub at about the time the murder was being carried out, paged Owen with a numeric signal, and then drove to the crime scene. After inquiring if her husband was dead, she took a flashlight and went toward the body to inspect it. Owen

> burned the victim's automobile with kerosene provided by Gissendaner, and the pair returned to their respective homes in Gissendaner's automobile. Owen disposed of the nightstick, the knife, a pair of his own jeans, and the victim's stolen jewelry by placing them in the garbage. A pair of Owen's sweat pants also worn on the night of the murder was recovered, however, and DNA analysis of blood found on them showed a likely match with the victim's and Owen's blood.
>
> After the murder, Gissendaner concealed her relationship with Owen from police and claimed not to have initiated contact with him for some time. Telephone records, Owen's testimony, and other witness testimony proved otherwise. After her arrest, Gissendaner called her best friend and confessed to her active and willing role in the murder, although she then called a second time and claimed that she was coerced into participating. Gissendaner wrote a letter while in jail in an effort to hire someone to give perjured testimony and to rob and beat witnesses.

Gissendaner v. State, 272 Ga. 704, 705 (2000).

At the sentencing phase of the trial, the jury found two aggravating circumstances: (1) that the murder of Douglass Gissendaner was committed during the commission of a kidnaping with bodily injury, see O.C.G.A. § 17-10-30(b)(2); and (2) that the Petitioner caused or directed another to commit murder, see O.C.G.A. § 17-10-30(b)(6). She was sentenced to death. The Georgia Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal and denied her motion for reconsideration. Gissendaner, 272 Ga. at 704. The United States Supreme Court denied her petition for a writ of certiorari and her motion for rehearing. Gissendaner v. Georgia, 531 U.S. 1196 (2001) (rehearing denied, 532 U.S. 1003 (2001)).

On December 18, 2001, the Petitioner filed a habeas corpus petition in the Superior Court of DeKalb County. (Res. Ex. 80.) The court held an evidentiary hearing on December 13 and 14, 2004. On February 16, 2007, the court denied the petition. (Res. Ex. 123.) On appeal, the Georgia Supreme Court affirmed the Superior Court's denial of relief and denied the Petitioner's motion for reconsideration. On January 9, 2009, Gissendaner petitioned this Court for a writ of habeas corpus [Doc. 1], and amended the Petition on May 28, 2009 [Doc. 16]. In a February 22, 2010 Order, the Court dismissed some of the Petitioner's claims as procedurally defaulted and dismissed some as unexhausted [Doc. 39]. The Court denied the Petitioner's Amended Petition on March 21, 2012 [Doc. 67]. On April 18, 2012, the Petitioner filed this Motion to Alter or Amend the Judgment [Doc. 69].

## II. Standard for Habeas Corpus Relief

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas corpus relief for claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first step

in resolving a federal habeas corpus claim is to determine the "clearly established law at the relevant time." Neelley v. Nagle, 138 F.3d 917, 922 (11th Cir. 1998), cert. denied, 525 U.S. 1075 (1999); see Williams v. Taylor, 529 U.S. 362, 379 (2000). To do so, a district court evaluating a habeas corpus petition under 28 U.S.C. § 2254(d)(1) "'should survey the legal landscape' at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority; the law is 'clearly established' if Supreme Court precedent would have compelled a particular result in the case." Neelley, 138 F.3d at 923. "Clearly established Federal law" does not refer to decisions of the lower federal courts but, rather, is limited to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." Putman v. Head, 268 F.3d 1223, 1241(11th Cir. 2001) (quoting Williams, 529 U.S. at 412). The second step of the analysis is to determine whether the state court adjudication was "contrary to" or an "unreasonable application of" the clearly established Supreme Court case law. Neelley, 138 F.3d at 923. A state court decision is contrary to clearly established federal law when it applies a rule that contradicts the governing law as set forth in cases before the Supreme Court of the United States. Williams, 529 U.S. at 405; Putman, 268 F.3d at 1241. Additionally, a "contrary to" finding will result if the state court confronts materially indistinguishable facts but arrives at a result different from that of the Supreme Court.

Williams, 529 U.S. at 406; Putman, 268 F.3d at 1241. Finally, the Supreme Court has explained that the "unreasonable application" prong applies when the "'state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413). In order to qualify as unreasonable, the state court decision must have been more than incorrect or erroneous. Id. Rather, the state court's application of clearly established federal law must have been "objectively unreasonable." Id. at 521 (citing Williams, 529 U.S. at 409).

### III. Discussion

A. Claim I (D): Ineffective Assistance of Counsel for Failure to Advocate for and Negotiate a Plea Agreement for a Sentence Less Than Death

The Petitioner fails to set forth any new facts or law that warrant amendment of the Court's March 21 Order. The state habeas court found that the Petitioner's trial counsel were not constitutionally deficient in plea negotiations. (Res. Ex. 123, at 45-46.) This Court cannot find that the state habeas court's conclusion was contrary to, or an unreasonable application of, Supreme Court precedent (both at the time the habeas court made its ruling and now), or based on an unreasonable determination of fact.

The Petitioner focuses upon the state habeas court's statement that "Petitioner has not cited any controlling authority, and the Court is not aware of such authority, in which counsel's failure to negotiate a plea has been found to constitute ineffective assistance of counsel." (Res. Ex. 123, at 46.) Now, in light of the Supreme Court's recent rulings in Lafler v. Cooper, 132 S. Ct. 1376 (2012), and Missouri v. Frye, 132 S. Ct. 1399 (2012), it is clear that defendants' Sixth Amendment right to counsel extends to plea negotiations. Cooper, 132 S. Ct. at 1384; Frye, 132 S. Ct. at 1407. However, the state habeas court nevertheless analyzed the proficiency of the Petitioner's trial counsel in negotiating a plea agreement according to the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), as required by Cooper and Frye. Cooper, 132 S. Ct. at 1384; Frye, 132 S. Ct. at 1409-11. The state habeas court concluded that trial counsel's performance was not deficient, and that the Petitioner had not shown a reasonable probability of prejudice, i.e., that the plea process would have been different with competent advice. Cooper, 132 S. Ct. at 1384. The state habeas court reasoned:

T:\ORDERS\09\Gissendaner\amendtwt.wpd        -7-

The evidence shows that to the contrary,[1] trial counsel discussed the plea offer from the prosecution with Petitioner. On behalf of Petitioner trial counsel made a counteroffer, but the prosecution declined that offer still asserting the original offer was on the table. There is no evidence that Petitioner did not understand the plea offer and risk of going to trial. Nor is there any evidence that trial counsel failed to assess the risk or discuss the possibility of a death sentence with Petitioner. In fact, the evidence shows that both lead counsel and co-counsel discussed the plea offer and the possible sentences if she chose to go to trial. Trial counsel has no duty to convince Petitioner to take a plea. Further, as to any claim that trial counsel gave her incomplete information as to parole or her options to plea or go to trial, there is no evidence to support such a claim. Nor is there any evidence that Petitioner's decision to go to trial or take the plea offer would be different with any different recommendation from counsel.

(Res. Ex. 123, at 45) (citations omitted).

Cooper and Frye require the state habeas court to analyze counsel's performance in the plea agreement setting as it would in the trial setting–according to the dictates of Strickland. Without explicitly citing Strickland in this subsection of its opinion (although the habeas court explicitly cited Strickland elsewhere in the opinion), the state habeas court applied the Strickland standard. The Supreme Court's rulings in Cooper and Frye do not convince this Court to alter or amend its Order

---

[1] The state habeas court stated that the evidence was contrary to the Petitioner's arguments. These arguments were: "Petitioner alleges that trial counsel unreasonably failed to advocate for a negotiated plea agreement for a sentence less than death. Petitioner argues that trial counsel failed to assess the risk of a death sentence, and conveyed to Petitioner an unrealistic belief for an opportunity of acquittal or no death sentence." (Res. Ex. 123, at 45.)

finding that the state habeas court's decision on this issue was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of fact.

Cooper and Frye are easily distinguishable from this case. In neither case did the Court actually consider whether counsel's performance was deficient. In Cooper, both parties agreed that counsel's performance was deficient. Cooper, 132 S. Ct. at 1384. In Frye, counsel's performance was deficient for failing to even communicate the government's formal plea deal offer. Frye, 132 S. Ct. at 1408-09. The Respondent contests the Petitioner's assertion that counsel's performance was deficient, and trial counsel did communicate the government's plea offer to the Petitioner, who rejected it.

B.   Claim XXXIII: Lethal Injection

The Respondent asks this Court to reconsider its ruling that the method-of-execution challenge was cognizable on the Petitioner's first petition for writ of habeas corpus. The Respondent has not shown any newly discovered evidence, an intervening change in controlling law, or a clearly erroneous decision by this Court. See Godby v. Electrolux Corp., No. 1:93-CV-0353-ODE, 1994 WL 470220, at *1 (N.D. Ga. May 25, 1994) (party may move for reconsideration only by showing: "an

intervening change in controlling law, the availability of new evidence, [or] the need to correct clear error or prevent manifest injustice.").

Turning to the lethal injection challenge itself, the Court declines to hold an evidentiary hearing to assess whether Georgia's lethal injection protocol violates the Eighth Amendment by creating "a substantial risk of serious harm." Baze v. Rees, 553 U.S. 35, 50 (2008). The Petitioner has not presented "new facts," "new evidence," or "new scientific and medical discoveries and research," Arthur v. Thomas, 674 F.3d 1257, 1260 (11th Cir. 2012), that the Eleventh Circuit has not already considered and dismissed in DeYoung v. Owens, 646 F.3d 1319 (11th Cir. 2011). See also Arthur, 674 F.3d at 1260 ("[W]e reviewed a complaint presenting identical allegations and relying on the same expert testimony and exhibits as were rejected in Powell (Williams), and we affirmed the dismissal of the complaint because its allegations and supporting evidence were indistinguishable from those in Powell (Williams).").

The Eleventh Circuit rejected DeYoung's argument that Georgia's lethal injection protocol violated the Eighth Amendment. DeYoung, 646 F.3d at 1327. Like DeYoung, Gissendaner, in her final merits brief, relied on an affidavit by Dr. David B. Waisel, who, after reviewing eyewitness accounts of Roy Blankenship's June 23, 2011 execution in Georgia, concluded that Blankenship experienced significant pain

during the execution. DeYoung, 646 F.3d at 1326; [Doc. 58, at Ex. 1]. After considering evidence that is materially indistinguishable to the evidence before this Court today, the DeYoung Court concluded that "DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic. As the district court succinctly found, Georgia's 'use of pentobarbital does not create a substantial risk of harm to inmates.'" DeYoung, 646 F.3d at 1327. The Petitioner has not presented evidence that Georgia deviated from its lethal injection protocol either during or since DeYoung's execution. This Court concludes that, like the Eleventh Circuit in DeYoung, Georgia's use of pentobarbital does not create a substantial risk of harm to inmates, and thus does not violate the Eighth Amendment.

## IV. Conclusion

For the reasons set forth above, the Court DENIES the Petitioner's Motion to Alter or Amend the Clerk's Judgment [Doc. 69].

SO ORDERED, this 6 day of June, 2012.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge